NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1833-24

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

GEORGE E. NORCROSS, III,
PHILIP A. NORCROSS,
WILLIAM M. TAMBUSSI,
DANA L. REDD, SIDNEY R.
BROWN, and JOHN J. O'DONNELL,

    Defendants-Respondents.

_____

> **APPROVED FOR PUBLICATION**
>
> **January 30, 2026**
>
> **APPELLATE DIVISION**

Argued November 5, 2025 – Decided January 30, 2026

Before Judges Gooden Brown, Rose and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 24-06-0111.

Michael L. Zuckerman, Deputy Solicitor General, argued the cause for appellant (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, Michael L. Zuckerman, Tim Sheehan, Michael T. Breslin, Michael Grillo, and Andrew Wellbrock, Assistant Attorneys General, Adam D. Klein, Diana L. Bibb, and Amanda E. Nini, Deputy Attorneys General, of counsel and on the briefs).

Anthony J. Dick (Jones Day) of the District of Columbia bar, admitted pro hac vice, argued the cause for respondent George E. Norcross, III (Critchley & Luria, LLC and Anthony J. Dick, attorneys; Michael Critchley, Thomas E. Hopson (Jones Day) of the District of Columbia bar, admitted pro hac vice, Mario E. Fiandeiro (Jones Day) of the District of Columbia bar, admitted pro hac vice, and Anthony J. Dick, of counsel and on the brief).

Kevin H. Marino argued the cause for respondent Philip A. Norcross (Marino, Tortorella, & Boyle, PC, attorneys; Kevin H. Marino, John D. Tortorella and Erez J. Davy, on the brief).

Lee Vartan argued the cause for respondent William M. Tambussi (Chiesa Shahinian & Giantomasi PC, attorneys; Jeffrey S. Chiesa, Lee Vartan, Jeffrey P. Mongiello, Kathryn Pearson, and Nathan A. Muller, of counsel and on the brief).

Henry E. Klingeman argued the cause for respondent Dana L. Redd (Klingeman Cerimele and Law Offices of Thomas R. Ashley, attorneys; Henry E. Klingeman, Ernesto Cerimele, Emma M. R. Enright, and Thomas R. Ashley, on the brief).

Lawerence S. Lustberg argued the cause for respondent Sidney R. Brown (Gibbons PC, attorneys; Lawrence S. Lustberg, Noel L. Hillman, Anne M. Collart, Kelsey A. Ball, and Jessica L. Guarracino, on the brief).

Gerald Krovatin argued the cause for respondent John J. O'Donnell (Krovatin Nau LLC, Jacobs & Barbone, PA and Arseneault & Fassett, LLC, attorneys; Gerald Kovatin, Edwin J. Jacobs, Jr., and David W. Fassett, on the brief).

A-1833-24

Robert E. Levy argued the cause for amici curiae New Jersey NAACP State Conference, New Jersey State AFL-CIO, and New Jersey Building and Construction Trades Council (Scarinci & Hollenbeck, LLC, attorneys; Donald Scarinci and Robert E. Levy, of counsel and on the brief; Matthew F. Mimnaugh, on the brief).

Eric Robert Breslin argued the cause for amicus curiae New Jersey State Committee of the American College of Trial Lawyers (Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, PC, attorneys; Rubin M. Sinins, on the brief).

Robert C. Scrivo argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Mandelbaum Barrett PC, attorneys; Robert C. Scrivo, Andrew Gimigliano, and Austin W.B. Hilton, on the brief).

David R. Kott argued the cause for amicus curiae New Jersey State Bar Association (Norberto A. Garcia, of counsel; Geoffrey N. Rosamond, David R. Kott, and Benjamin T. Klein, on the brief).

The opinion of the court was delivered by

ROSE, J.A.D.

The State appeals from a February 26, 2025 Law Division order dismissing a 111-page, thirteen-count, "speaking indictment"[1] that charged

---

[1] A "speaking indictment" is a discretionary instrument, distinguished from a conventional indictment, in that it "provides a significant amount of detail as to

George E. Norcross, III, Philip A. Norcross, William M. Tambussi, Dana L. Redd, Sidney R. Brown, and John J. O'Donnell – purported members of the alleged "Norcross Enterprise" – with conspiracy to violate the New Jersey Racketeer Influenced and Corrupt Organizations Act (RICO or racketeering), N.J.S.A. 2C:41-1 to -6.2, and other offenses. At its crux, the June 13, 2024 State indictment alleged the Enterprise members exerted pressure on private individuals and entities, and public officials, to advance the Enterprise's goals related to redeveloping the City of Camden. One of those goals allegedly was accomplished by obtaining three redevelopment projects: (1) L3 Complex; (2) Triad1828 Centre and 11 Cooper; and (3) Radio Lofts – the first two of which yielded some Enterprise members lucrative tax credits.

More particularly, all six defendants were charged with committing:

- first-degree racketeering conspiracy, N.J.S.A. 2C:41-2(d), (count one), between 2012 and June 13, 2024;[2]

---

the [g]overnment's theory of the case and the nature of the proof." 5 Wayne R. LaFave et al., Criminal Procedure § 19.3(c) (4th ed. Supp. 2024).

2 The pattern of racketeering alleged in count one was premised on underlying criminal conduct including: (1) interference with commerce or threats or violence, 18 U.S.C. § 1951 (Hobbs Act); (2) theft by extortion, N.J.S.A. 2C:20-5; (3) financial facilitation of criminal activity, N.J.S.A. 2C:21-25; (4) misconduct by corporate official, N.J.S.A. 2C:21-9; and (5) conspiracy to commit those crimes, N.J.S.A. 2C:5-2. For purposes of this appeal, the parties

A-1833-24

- first-degree conspiracy to commit theft by extortion, criminal coercion, financial facilitation of criminal activity, misconduct by corporate official, and official misconduct, N.J.S.A. 2C:5-2, (count three - Triad1828 Centre and 11 Cooper) between April 16, 2013 and June 13, 2024;

- four counts of first-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(a), (c), (count five - Triad1828 Centre credits, possession); (count six - Triad1828 Centre credits, directing transactions); (count nine – 11 Cooper credits, possession); and (count ten – 11 Cooper credits, directing transactions), between January 1, 2013 and June 13, 2024;

- second-degree misconduct by a corporate official, N.J.S.A. 2C:21-9(c), (count twelve – Triad1828 Centre and 11 Cooper Companies), between April 16, 2023 and June 13, 2024; and

- second-degree official misconduct, N.J.S.A. 2C:30-2,[3] (count thirteen), between January 1, 2014 and December 31, 2024.

In addition, George,[4] Philip, Redd, and Tambussi were charged with:

---

treat potential Hobbs Act violations as coterminous with state law extortion; the State does not contend that either offense could survive if the other failed.

[3] Although the indictment did not include citation specifying whether it charged a violation of subsection (a) (acts), (b) (omissions), or both, its language was tailored to the text of subsection (a) alone.

[4] Because George Norcross and Philip Norcross share the same surname, we use first names for clarity. No disrespect is intended.

- first-degree conspiracy to commit theft by extortion, criminal coercion, financial facilitation of criminal activity, misconduct by corporate official, and official misconduct, N.J.S.A. 2C:5-2, (count two – L3 Complex), between June 5, 2013 and June 13, 2024;

- two counts of first-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(a), (c), (count seven – L3 Complex credits, possession); (count eight – L3 Complex, directing transactions), between January 1, 2013 and June 13, 2024; and

- second-degree misconduct by a corporate official, N.J.S.A. 2C:21-9(c), (count eleven – Cooper Health), between June 5, 2013 and June 13, 2024.

Further, George, Philip, and Tambussi were charged with:

- second-degree conspiracy to commit theft by extortion and criminal coercion, N.J.S.A. 2C:5-2, (count four – Radio Lofts), between October 1, 2013 and October 31, 2023.

The indictment also sought forfeiture of alleged ill-gotten gains from all six defendants pursuant to N.J.S.A. 2C:41-3(b).

George moved to dismiss the indictment and the remaining defendants followed suit. Defendants argued the indictment, on its face, failed to allege the criminal offenses charged and violated the applicable statutes of limitations. Following a series of correspondence and conferences, the motion court

6

determined its review would be limited to the "four corners" of the indictment, accepting all facts and reasonable inferences drawn therefrom as true, and would not as the State requested, include a review of the grand jury record.[5] Defendants preserved their right to challenge the sufficiency of the State's evidence presented to the grand jury in a subsequent motion.

The motion court thereafter granted the Association of Criminal Defense Lawyers of New Jersey (ACDL) leave to appear as amicus curiae, and New Jersey NAACP State Conference, New Jersey State AFL-CIO, and New Jersey Building and Construction Trades Council (collectively, Organizational Amici) leave to appear jointly as amici curiae.

Following lengthy oral arguments on January 22, 2025, the motion court reserved decision. On February 26, the court issued a ninety-six-page written decision and accompanying order dismissing the indictment. In summary, the court found as a matter of law: the factual allegations set forth in the indictment failed to constitute the offenses of theft by extortion or criminal coercion, which

---

[5] In its merits brief, the State asserts, during the five-month presentation, the grand jury heard testimony from witnesses "totaling over 2,000 pages of testimony" and reviewed "some 341 exhibits." The State also notes the prosecution "turned over in discovery more than 4.3 million files, more than 6,000 wiretap recordings[,] and at least 700 hours of audio recordings, including the interviews of about 100 people."

A-1833-24

underpinned all other offenses; the indictment failed to allege a racketeering enterprise; "Redd did not commit any act of official misconduct"; and "[a]ll charges [we]re facially time-barred."

The State appealed. We thereafter separately granted the New Jersey State Committee of the American College of Trial Lawyers (NJ-ACTL) and New Jersey State Bar Association (NJSBA) leave to appear as amicus curiae. The ACDL and the Organizational Amici participate in this appeal pursuant to Rule 1:13-9(d)(1).

The State challenges the motion court's decision on procedural and substantive grounds. The State maintains the court's facial review of the indictment exceeded its bounds by conducting a searching "sufficiency-of-the-evidence-included-in-the-indictment test" without reviewing the grand jury record. Arguing the court erroneously established a new and unjustifiable standard of review, the State claims the court should have limited its analysis of defendants' facial challenges to whether the speaking indictment alleged the elements of the offenses in the same way required of non-speaking "barebones" indictments. Contending the indictment sufficiently alleged the offenses charged, the State claims the court failed to accept the truth of the allegations and interpret any inferences in the light most favorable to the prosecution.

A-1833-24

Further, the State asserts the court erroneously held the offenses concluded when the redevelopment deals were completed and therefore were time-barred under the applicable statutes of limitations. The State claims the conspiracy continued beyond the limitations periods because: defendants received tax credits from the developments; after the Enterprise acquired those developments, certain defendants made statements constituting "acts of concealment" of the crimes; or the Enterprise continued to pursue its objective of "promoting compliance" through intimidation and similar tactics.

Not surprisingly, defendants urge us to affirm the dismissal order substantially for the reasons embraced by the motion court. Supported by the Organizational Amici, defendants warn criminalizing the behavior alleged in the indictment would imperil valuable political advocacy, collective bargaining, and similar activity. The ACDL, NJ-ACTL, and NJSBA (collectively, Legal Amici) assert the indictment of attorneys, such as Philip and Tambussi, for actions involving the practice of law would exert a chilling effect, detrimental to lawyer and client alike.

As a threshold matter, we reaffirm a speaking indictment is subject to the same facial review as non-speaking indictments; defendants' motions called for

9

no more.  For purposes of our review, similar to the motion court, we assume the truth of all facts alleged in the indictment.

We are not convinced, however, that we must afford the State the benefit of all reasonable inferences drawn therefrom.  We acknowledge before the motion court and this court, the parties agreed the review of the factual assertions in the indictment should be conducted under the "light most favorable"/"favorable inferences" standard.  However, the court and the parties have not cited, and our research has not revealed, any authority requiring, or indeed, authorizing the court to adopt such an indulgent standard.  But see State v. De Vita, 6 N.J. Super. 344, 347 (App. Div. 1950) (explaining "[t]he essential facts constituting the crime must be directly stated in the indictment" and "[t]he omission of an essential element cannot be supplied by inference or implication"); cf. State v. Saavedra, 222 N.J. 39, 56-57 (2015) (applying the "light most favorable"/"favorable inferences" standard when the trial court reviews the sufficiency of the evidence presented to the grand jury).

Based on our de novo review, see State v. S.B., 230 N.J. 62, 67 (2017), we conclude:  the charges arising from the conspiracies alleged in counts one through three, and the official misconduct offense asserted in count thirteen, were untimely; the offenses charged in counts four through ten failed to state

A-1833-24

the offense charged; and the offenses charged in counts eleven through twelve were time-barred and otherwise failed to state an offense. We therefore affirm the February 26, 2025 order for slightly different reasons than the motion court. See Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (permitting appellate courts to affirm for reasons other than those expressed by the trial court because "appeals are taken from orders and judgments and not from opinions" (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001))).

In reaching our decision on the time-barred conspiracy counts, we consider, as a matter of first impression, whether the receipt of ongoing, otherwise lawful payments – here, tax credits – tolls the applicable statute of limitations. Persuaded by federal law, for the reasons that follow, we adopt the rationale underscoring the "Doherty/Grimm doctrine."[6] We therefore hold the long-term, recurring award of tax credits does not extend the statute of limitations for a conspiracy offense.

We similarly consider the novel issue underscoring the State's theory that the receipt of a benefit extended the statute of limitations for an official misconduct charge when the indictment did not assert an express agreement to

---

[6] See United States v. Grimm, 738 F.3d 498, 503 (2d Cir. 2013); United States v. Doherty, 867 F.2d 47, 61 (1st Cir. 1989).

perform the act of misconduct in exchange for that benefit. We conclude the mere receipt of a benefit under those circumstances does not extend the life of an official misconduct charge indefinitely.

I. The Indictment's Factual Allegations

The factual allegations of the indictment were set forth in 211 paragraphs and spanned eighty pages. Pursuant to our de novo review, similar to the motion court, we catalog the alleged facts that inform our decision. In view of the State's procedural and substantive contentions, we summarize the facts alleged in the indictment in substantial detail.

A. Individuals and Organizations

The indictment commenced with an "Overview" of the Norcross Enterprise, "whose members and associates agreed the [E]nterprise would extort others through threats and fear of economic and reputational harm and commit other criminal offenses to achieve the [E]nterprise's goals." The "Relevant Individuals and Entities" were identified in the indictment as follows:

> George: chair of the board of trustees of Cooper University Health Care (Cooper Health); executive chair of Conner Strong & Buckelew (CSB), an insurance firm; "partner in the groups that own the Ferry Terminal Building, 11 Cooper, and the Triad1828 Centre"; former member of Cooper's Ferry Partnership (CFP); former chair of the Camden County Democratic Committee (CCDC); former member of the Democratic

12

National Committee; and, according to the indictment, George "exercises control of Democratic politics throughout South Jersey, and beyond."

Philip: managing shareholder and chief executive officer (CEO) of the Parker McKay law firm; chair of the board of the Cooper Foundation, a nonprofit organization associated with Cooper Health; Cooper Health board member; and "registered agent for the groups that own the Ferry Terminal Building and the Triad1828 Centre."

Tambussi: an attorney with the Brown and Connery law firm, often employed by George, the CCDC, the City, the Camden Redevelopment Agency (CRA), Cooper Health, and CSB.

Redd: CEO of Camden Community Partnership (CCP), CFP's successor; and served on the City Council from 2001-10, as the City's mayor from 2010-18, and as CEO of the Rowan University/Rutgers-Camden Board of Governors from 2018-22.

Brown: CEO of NFI, a trucking and logistics company; Cooper Health board member; and partner in the groups that own the Ferry Terminal Building, Triad1828, and 11 Cooper.

O'Donnell: CEO of The Michaels Organization (TMO), a residential development company; partner in the Ferry Terminal Building, Triad1828, and 11 Cooper; and periodic member of CFP/CCP.

New Jersey Economic Development Authority (EDA): an independent government entity created to "attract and expand industry in New Jersey," which owned real property parcels and redevelopment rights in and around the City's waterfront.

13

CFP: "a private nonprofit corporation dedicated to planning and implementing redevelopment projects in the City of Camden" by working with private and public sector actors, previously known as Cooper's Ferry Development Association (CFDA); and subsequently known as CCP.

Liberty Property Trust (LPT): a real estate investment trust, which "purchase[d] the rights to develop Camden waterfront properties from Steiner & Associates," which was involved in development projects in the City.

Dranoff Properties, Inc. (DPI): a residential developer "led by its founder (Developer-1)";[7] involved in the Victor Lofts and Radio Lofts redevelopment projects.

CRA: created in 1987 by the City Council "to redevelop the waterfront."

B. Economic and Legislative Backdrop

Commencing with paragraph 21, the indictment provided background on the City's government structure, history as "an industrial and manufacturing hub," and eventual decline after many companies ceased operations. City officials thus endeavored "to revitalize the downtown area," focusing on the City's Waterfront District. In 1984, the CFDA was established "to work with

---

[7] We use the same designations as the indictment to protect the identities of the individuals named therein.

 A-1833-24

public and private entities to redevelop the waterfront"; in 1987, the CRA was established to accomplish that purpose.

The indictment next described the tax credit incentives available to redevelopers, pursuant to the "Grow New Jersey Assistance Program"[8] (Grow NJ). Pursuant to Grow NJ, tax credits were awarded to businesses meeting certain criteria, such as making capital investments in a qualified incentive area. The State accepted Grow NJ applications through July 2014. Approved tax credits were issued annually, permitting qualified businesses to offset their state tax liabilities or sell the credits to another company for that purpose. Further, the Economic Opportunity Act of 2013 (EOA)[9] "streamlined" New Jersey's five economic development programs into two: Grow NJ and the Economic Redevelopment and Growth (ERG) program.

In the next section, under a heading titled, "The Norcross Enterprise's Efforts to Craft the EOA for its Use and Benefit," the indictment described at

---

[8] See N.J.S.A. 34:1B-242 to -250. Enacted in 2011 and effective January 2012, the Grow New Jersey Assistance Act authorized the EDA to award tax credits to eligible businesses "to encourage economic development and job creation and to preserve jobs that currently exist in New Jersey but which are in danger of being relocated outside of the State." N.J.S.A. 34:1B-244(a).

[9] See L. 2013, c. 161. The EOA is codified as amended in scattered sections of Titles 34 and 52 of the New Jersey Statutes.

length defendants' interests and involvement in the EOA. For example, the indictment referenced a meeting held in "2012 or 2013," during which George told CFP and Cooper Health officials the new law would be "for our friends" and expressed his wish to use the EOA to "construct an office building for free."

The indictment further summarized communications among Philip, "representing [George's] interests," another Parker McCay attorney (Lawyer-1), and various CFP executives. In these communications, the group allegedly discussed their preferred focuses for the new legislation.

In the paragraphs that followed, the indictment described the "Norcross Enterprise's Involvement in Drafting the EOA." The indictment alleged between June 30, 2012 and September 30, 2013, Philip "communicated directly with the then-State Senate President . . . regarding the drafting of the EOA." Further, "[o]n June 4, 2013, Lawyer-1 sent an email, copying [Philip], to representatives of the[ ]then Governor's office" with an edited draft of the EOA. The indictment alleged the revisions favored George's interests, such as ensuring Camden-based projects and projects benefiting hospitals "would have an easier route to approval."

After the bill was enacted, in December 2013, Lawyer-1 "lobbied the EDA" to ensure a hospital, "such as Cooper Health" would not be defined as

16

"point of sale retail" thereby enabling "a hospital to take advantage of the EOA and apply for tax credits." According to the indictment, "[t]he EDA made the requested amendment" to its regulations.

The indictment also detailed George's actions while the legislation was in progress. George allegedly "obtained information about the status of various redevelopment rights on the Camden waterfront" and explored the status of "a view easement held by Developer-1 to protect the views from the Victor Lofts, which would expire in 2022."

### C. The Redevelopment Projects

In paragraphs 47 through 211, the indictment described the Enterprise's acquisition of the three redevelopment projects, exertion of pressure on the developers during the processes of those acquisitions, and derivation of benefits realized therefrom.

### 1. The L3 Complex

As alleged in the indictment, during 2012, CFP explored options to purchase from the EDA the L3 Complex near the waterfront. Beginning in 2013, members of the Enterprise pressured CFP's CEO (CFP CEO-1) to collaborate with the Enterprise and its favored developers. For example, in 2013, Redd's chief of staff, referenced in the indictment as CC-2, "told CFP CEO-1 that he

A-1833-24

should start meeting with Philip . . . and herself" to ensure CFP had George's and Philip's approval for "various projects going forward." Philip, Redd's chief of staff, and CFP CEO-1 thereafter met "regularly" in what would "later evolve[] into weekly Camden 'stakeholder' meetings," even though Philip did not have a role at CFP or a position in the Camden City government.

By way of context, the indictment alleged around that same time, CFP CEO-1 was aware CFP's founder had a dispute with George "in the early 2000s," and thereafter "the Camden government had cut off or reduced funding to CFP." CFP CEO-1 also knew CFP's founder believed George caused the funding cut – and the founder left CFP and Camden as a result.

In paragraphs 56 through 67, the indictment described the Enterprise's reaction to CFP's January 20, 2014 "agreement of sale with the EDA to buy the L3 Complex for approximately $32.7 million," a price discounted roughly ten percent below market value in light of CFP's nonprofit status. The indictment detailed George's alleged angry reaction to the agreement and Philip's statements to "CFP CEO-1 and CFP['s p]resident[] that CFP should not be involved in development and should turn the deal over to a private investor partner" recommended by the Enterprise, rather than CFP's preferred developer. On April 23, 2014, Cooper Health's CEO emailed CFP officials to handle the issue

18

"gingerly" because Philip was "still torqued about [CFP's] 'blowing off' [Investor-1]," the Enterprise's recommended developer.

Around the same time, as alleged in paragraphs 68 and 69 of the indictment, Cooper Health explored its options for relocation. By April 2014, however, Cooper Health determined, "even with tax credits," it could not afford to construct a new building and only the L3 Complex suited its needs.

Paragraphs 70 through 79 of the indictment described Philip's putative threats to CFP CEO-1 to relinquish CFP's partnership with its chosen investors and CFP's ultimate assent to do so. During an April 25, 2014 meeting, in the presence of Redd's chief of staff, Philip "told CFP CEO-1 that CFP was not allowed to use [CFP's investor] and it should only use Investor-1." CFP CEO-1 considered Philip's statement "a threat" because CFP CEO-1 was aware of George's historical "dispute" with CFP's founder. CFP's officials therefore "agreed to partner with Investor-1 and another real estate investor working with Investor-1" (Investor-2).

On May 9, 2014, "Investor-2 emailed an offer to CFP to acquire a joint interest in the L3 Complex," which CFP's president considered "very very light" because the offer "was over $2 million less" than CFP's deal with its investor.

A-1833-24

CFP's president viewed the option between CFP's chosen investors and those preferred by the Enterprise, a "false choice . . . given the opposition."

During the negotiations, CFP CEO-1 contacted Redd's office "for help on the deal, explaining the negative financial consequences for CFP."  Redd, who was a co-chair of CFP, and Redd's chief of staff both told CFP CEO-1 "he had to deal with Philip . . . to resolve" his concerns.  "Redd and [her chief of staff] also told CFP CEO-1 at various stages during the L3 transaction that his job was in jeopardy."

As of summer 2014, CFP "verbally agreed" with Investor-1 and Investor-2 "that CFP would purchase the L3 Complex" with financing secured by the investors, then sell the property to L/N CAC, an entity created by the investors, while retaining a share of the profits.  Around the same time, Cooper Health agreed with the investors that it would be a part of L/N CAC.  The plan was subsequently rescinded when Philip "informed Cooper Health officials that having an ownership interest in the L3 Complex would complicate its application for tax credits."  Cooper Health officials and the investors agreed "Cooper Health would not officially become part of the ownership entity until after the EDA had awarded Cooper Health tax credits."

A-1833-24

In late September 2014, Cooper Health's CEO, who also sat on the board of, and co-chaired, CFP died unexpectedly. His roles at CFP were filled by Cooper Foundation's CEO (CC-1). Redd informed CFP CEO-1 that she "had been told" to appoint CC-1 and that his appointment would "help get CFP back on [George's] side"; Philip told CFP CEO-1 that CC-1's appointment would help "mend fences" with George.

Between October 1 and December 30, 2014, CFP CEO-1 told CC-1 "the deal kept getting worse for CFP and that there still was not a signed agreement." CC-1 responded that CFP CEO-1 "had to deal with [Philip] and pushed him to close the transaction."

Paragraphs 82 and 83 of the indictment described CFP's purchase and sale of the L3 complex. On December 30, 2014, CFP closed on the L3 Complex, which was "appraised at $54 million." That same day, CFP conveyed the property to L/N CAC for $1 and netted "approximately $125,000 for its role in the L3 Complex transaction, which [wa]s far less than CFP stood to earn through its proposed partnership" with its preferred investor. Also, "CFP did not receive a share of the L3 Complex's future profits."

In paragraphs 80 through 81, and 85 through 88, the indictment described the tax incentives awarded to Cooper Health in connection with the L3 Complex.

A-1833-24

Specifically, in its November 7, 2014 application to the EDA, seeking tax credits for its forthcoming move to L3, Cooper Health "identified Investor-2" as the landlord but "did not disclose its plans to become part owners for the L3 Complex to the EDA." At that time, George was the chair of Cooper Health's board of trustees. On December 9, 2014, the EDA approved a $39,990,000 tax credit award to Cooper Health, payable over ten years, subject to annual certifications of continued job creation and retention.

In 2015, Cooper Health signed a lease agreement with L/N CAC and occupied the L3 Complex. In March 2015, Cooper Health purchased an ownership interest in L/N CAC valued at approximately $2.45 million. Between January 2016 and June 2022, Cooper Health filed six annual certifications and received $27,114,000 in tax credits. Cooper Health sold the tax credits to third parties for $25,080,450.

In paragraph 88, the indictment concluded the Norcross Enterprises' conduct regarding the L3 Complex caused: (1) CFP "to partner with L/N CAC, rather than its preferred development partner"; (2) L/N CAC "to obtain a building appraised at $54 million for less than $34 million in funding, including payments to the EDA and a fee to CFP"; (3) Cooper Health to "bec[o]me 49% partners in L/N CAC, which owned the L3 Complex, at a cost of approximately

A-1833-24

$2.45 million"; (4) Cooper Health "to lease space in the building, and pay rent to an entity that was 49% owned by Cooper Health"; (5) Cooper Health to receive a $40 million tax credit award; and (6) "[i]n 2017, L/N CAC [to] refinance[ its] bank loan on the L3 Building and obtain[] a disbursement of approximately $10 million."

The indictment next addressed statements made by members, agents, and associates of the Enterprise in the years following the L3 deal. In paragraphs 89 and 90, the indictment discussed an August 2016 Federal Bureau of Investigation interview, the reason for which was undisclosed. George, accompanied by Tambussi, professed not to "know anybody" at CFP and told agents, "I don't know what they do."

Relatedly, in paragraphs 91 and 92, the indictment asserted, "[b]etween October 3, 2019 and December 2022, agents of members and associates of the . . . Enterprise made statements to members of the media in order to conceal the true facts surrounding the L3 acquisition." In particular, "[t]hese statements promoted the claims that CFP was not capable of purchasing L3, that CFP planned to use Cooper Health funds to finance the deal, and that Cooper Health CEO-1 had unilaterally committed Cooper Health to an above-market lease in L3 without the knowledge of other Cooper Health officials." The indictment

23

identified three such statements:  an October 3, 2019 statement by "a spokesperson" for George and Philip; an October 17, 2019, Philadelphia Inquirer article referring to unnamed "Cooper Health officials"; and a May 2022 call among Tambussi, George, and others with a WNYC reporter, later "posted online by the New Jersey Globe."

## 2. The Triad1828 Centre and 11 Cooper

In paragraphs 93 through 172, the indictment alleged members of the Enterprise pressured DPI and its operator, Developer-1, to sell certain waterfront property and view easement rights to a third-party developer favored by the Enterprise.  Those transactions enabled the Enterprise to construct an office building (Triad1828) on the Triad parcel and a residential building (11 Cooper) on the 11 Cooper site, capturing significant tax credits in the process.

More particularly, the indictment alleged from around "2013 to the present," George and other Enterprise members "conspired to extort from DPI and Developer-1 tax credits and rights to develop the Camden [w]aterfront . . . to allow the construction of a headquarters for [George's] CSB firm and two other businesses run by [Enterprise members] . . . and to obtain tax credits and residential development rights held by Developer-1."  The Enterprise members

and related companies thereafter "sold the tax credits for millions of dollars and continue to retain the rights to obtain and sell future tax credits."

The indictment alleged to accomplish its purpose, the Norcross Enterprise contended with "several significant impediments" concerning redevelopment of the Triad parcel and 11 Cooper site because the Enterprise held no ownership or other rights to redevelop the property; redevelopment options were held by other entities; DPI's view easement at the Victor Lofts limited the height of structures on the Triad parcel; and DPI "possessed a right of first refusal for residential development area in the Camden Waterfront area, which included the 11 Cooper site."

According to paragraph 95 of the indictment,

> when negotiations with Developer-1 to sell his property and rights did not proceed to [George]'s liking, [he]: (1) threatened Developer-1 with economic and reputational harm; (2) conspired to cause the City . . . to condemn Developer-1's rights through legal action to gain leverage in their negotiations; (3) plotted for Camden City officials to publicly "accus[e]" Developer-1 of being "not a reputable person"; (4) caused certain Camden City officials, including the [m]ayor, to stop communicating with Developer-1; and (5) plotted to damage an unrelated project of Developer-1's using the Camden government.

The following paragraphs set forth DPI's historical involvement in the Camden waterfront, including its recruitment by the CFP founder's predecessor

25

to develop the area in the early 2000s. In redeveloping a former manufacturing building to the residential units comprising Victor Lofts, DPI was afforded: (1) a "payment in lieu of taxes (PILOT) agreement with the City," (2) a view easement "limiting the height of structures that could block the Victor's view of the Delaware River and the Philadelphia skyline," (3) a "right of first refusal for residential development in the Camden Waterfront Development area," and (4) an option to redevelop another building in the area (Radio Lofts).[10]

In paragraphs 99 through 108, the indictment recounted "[George's] Plans to Put the EOA Into Action," commencing with a January 23, 2014 email to LPT officials "to discuss how to properly plan the [w]aterfront" and "deal[] with land issues/options/ownership." The indictment alleged George sought the meeting even though he did not hold a City position, own waterfront property, or have "any business interest in the Waterfront [D]istrict" other than as Cooper Health's chair. The following month, George and Philip met with representatives of LPT and EDA regarding the status of the waterfront's plans and agreements.

The indictment also cited a September 24, 2015 press conference announcing plans to redevelop the waterfront. George and Redd attended the

---

[10] The indictment explained redevelopment of Radio Lofts stalled around 2010 due to environmental remediation issues.

A-1833-24

press conference, as did the then governor. George, Brown, and O'Donnell were listed in the press release as "local leaders who have committed to investing in the project either personally or through their firms." But, at that time, George, Brown, and O'Donnell did not have any "business interests in LPT or the property being redeveloped."

In paragraphs 109 through 154, the indictment detailed LPT's negotiations with Developer-1, George's threats to Developer-1, and Developer-1's relinquishment of certain property and rights to LPT for less than Developer-1 believed they were worth.

According to the indictment, LPT's negotiations with Developer-1 began in the latter part of 2015, which led to a year-long series of meetings and correspondence. Philip, as counsel to LPT, and George were present at the meetings. At some point during the negotiations, LPT's CEO told Developer-1 "he would have to partner with TMO – of which [O'Donnell] was CEO – going forward in connection with his Camden Waterfront interests." Developer-1 "had reservations" but "continued negotiating" because he "wanted to participate in the development and trusted the LPT CEO." Developer-1 was "wary of working with [George] but understood him to be a powerful individual in Camden and knew that LPT intended to work with [George] and TMO."

27

While negotiations were ongoing in 2015-16, Developer-1 applied for "tax credits for the residential development project as a joint venture between DPI and TMO." In March 2016, Redd signed a letter on the City's behalf supporting the application. Thereafter, negotiations between Developer-1 and TMO "broke down." Developer-1 was uncomfortable with TMO's "level of control" and "did not need or want a partner for residential development."

"[D]uring a conference call in the summer of 2016," George threatened Developer-1 stating, "if you f\*\*k this up, I'll f\*\*k you up like you've never been f\*\*ked up before. I'll make sure you never do business in this town again." According to the indictment, Developer-1 "took this threat seriously, believing that if he stood in the way of LPT['s] obtaining DPI's residential development rights or extinguishing DPI's view easement, Developer-1's ability to conduct business in Camden and his financial interests in general would be in jeopardy." Philip was present on the call.

In August 2016, George admitted he made the threat during a recorded conversation with a CSB senior executive. Among other things, George acknowledged he "insulted" Developer-1 and commented, "obviously I'll never do business with the guy again."

A-1833-24

Later that same month, during a recorded conversation with the LPT CEO, George disclosed "his motivations for threatening Developer-1." George explained "[his] group was committed to constructing its building and that the Developer-1 view easement issue was preventing his group from filing its application." George further stated that if he "walked away, it would be a . . . bad thing for the [C]ity" and "humiliating" for him personally. George also noted he had discussed this issue with O'Donnell.

In paragraphs 122 through 125, under a heading titled, "[George] Makes Good on His Threat to Developer-1 By Directing City Officials to Freeze Him Out," the indictment explained while negotiating with the Norcross Enterprise and LPT concerning the Triad parcel in 2016, Developer-1 sought to confer with City officials concerning his options to redevelop the Radio Lofts building. However, Redd did not return his calls. "Unbeknownst to Developer-1, his calls were not being returned because [Philip] instructed [Redd] and [her chief of staff] not to meet with Developer-1 because [Philip] was negotiating other matters with Developer-1 as part of the waterfront development."

Paragraphs 126 through 151 encompass the next section of the indictment, titled, "'A Bat Over His Head': The Norcross Enterprise Follows Through on Its Threats by Plotting a Condemnation Action to Strip Developer-1 of His

A-1833-24

Interests."  In mid-October 2016, with these issues still unresolved, George, Philip, Tambussi, Brown, and O'Donnell allegedly "agreed to cause the CRA to bring court action against DPI with the purpose of creating additional pressure on Developer-1 to sell his rights."  Specifically, Philip and Tambussi, "and members of their respective law firms, coordinated to devise a plan by which the CRA, a City government entity and client of [Tambussi]'s firm, would seek to condemn Developer-1's view easement."

According to the indictment, Philip and Tambussi exchanged memoranda evaluating the legal merits, likelihood of success, and potential timeline of a CRA-initiated condemnation of Developer-1's easement.  On October 20, 2016, "Tambussi's law partner, Lawyer-2, who represented the CRA," emailed the CRA's executive director, proposing the CRA "file an application in [c]ourt . . . to confirm that the power of eminent domain is available to extinguish the view easement."

That same day, George and Philip spoke with Developer-1 and his attorney.  George "again threatened Developer-1 that there would be consequences if he did not reach an agreement to release his view easement and transfer his right of first refusal on residential development, associated redevelopment rights, and tax credits."

30

The October 20, 2016 negotiations resulted in a proposed deal with Developer-1. Philip conveyed the terms to LPT that night, LPT generated a draft agreement on October 21, 2016, but the deal "fell through" that same day.

Also on October 21, 2016, George told a friend that during the previous day's call, Developer-1 "tried to f\*\*king shake us down. As usual . . . And I told him, 'No.' I said, '[Developer-1], this is unacceptable. If you do this, it will have enormous consequences.' He said, 'Are you threatening me?' I said, 'Absolutely.'"

Later on October 21, 2016, in a recorded conversation between George and Philip, George referenced a discussion he had with Tambussi and "the plan to use [Tambussi] and the CRA to act against Developer-1." During another call, George and O'Donnell discussed "what had happened with Developer-1 that day and linked the condemnation action with the Norcross Enterprise['s] obtaining an advantage in its negotiations with both Developer-1 and LPT."

During an October 22, 2016 call, George, Philip, Tambussi, Brown, O'Donnell, and another executive discussed the condemnation plan and its potential benefits. George remarked:

> I don't even know why we're dealing with [Developer-1]. . . . [T]he [C]ity ought to condemn his ass and just move on . . . he's gonna come under some very serious accusations from the City of Camden which are gonna

A-1833-24

basically suggest that he's not a reputable person and he's done nothing but try to impede the progress of the [C]ity . . . you can never trust him until you got a bat over his head.

George also said "the [C]ity should instigate" the removal of Developer-1's unused Radio Lofts redevelopment rights, calling the building "an eyesore," and framing it as a way "to apply additional pressure" or "another point of attack."

Later that day, Philip notified LPT that the CRA was "seriously considering . . . seeking an immediate ruling confirming CRA's right to condemn the view easement." He added, "[a]s a showing of good faith," Camden Partners[11] would file their tax credit application, thereby formalizing their commitment to the project, as soon as the action was filed, but asked "in return" that LPT cooperate in the condemnation proceeding.[12]

Ultimately, LPT declined to cooperate. Instead, LPT "offered to pay Developer-1 an additional approximately $200,000 out of its own end of the

---

[11]  The indictment loosely defined the "group" that "referred to itself as the Camden Partners Tower Group" or "Camden Partners" as "the group seeking to build on the Triad Parcel." Various other apparently related corporate entities, such as Camden Partners Land LLC, Camden Partners Tower Equities, and CP Residential, were mentioned throughout the indictment, but their unifying corporate structure, if any, was not explained.

[12]  The declaratory action was never filed.

A-1833-24

deal, which brought the total cash value of the transaction to $1.95 million, in order to resolve the matter."

Paragraphs 152 and 153 described Devloper-1's relinquishment of his rights. On October 24, 2016, Developer-1 agreed to extinguish the Victor Lofts view easement and sell his residential development property rights, rights of first refusal, and $18 million in tax credits that accompanied the planned 11 Cooper development.

According to the indictment, although Developer-1 was "open to extinguishing the Victor Lofts view easement," he "believed that it was worth more than what he was ultimately paid for it." Developer-1 "also wanted to participate in the residential redevelopment as part of the project with LPT" but George's "threats . . . led Developer-1 to conclude that remaining in the project – or sticking to his price for the value of his various rights – would lead [George] to use his control of the Camden government to cause DPI financial harm." Developer-1 "also feared [George] would attack his business in the media which would cause his firm reputational harm."

In paragraphs 155 to 157, the indictment described Tambussi's efforts to "Conceal" the "Enterprise's Plot" during the 2018 litigation between Developer -1 and Tambussi's clients, the City and CRA, regarding the Radio Lofts site. We

discuss those allegations below in the context of the assertions concerning Radio Lofts.

In the sections that followed, the indictment detailed the Norcross Enterprise's application for, and receipt of, tax credits for Triad1828 Centre and 11 Cooper, and asserted the credits were awarded "as a Result of Extorting Developer 1's Interests." In particular, on October 24, 2016 – the same day Developer-1 relinquished his rights outlined above – CSB, owned by George, NFI, owned by Brown, and TMO, led by O'Donnell, applied for Grow NJ tax credits, proposing to construct and relocate to an office building on the newly acquired Triad parcel.

On March 24, 2017, tax credits were awarded to CSB for $86.2 million, NFI for $79.3 million, and TMO for $79.3 million. The Triad1828 Centre was owned by Camden Partners Tower Equities, which was comprised of limited liability companies associated with George, Brown, and O'Donnell. CSB, NFI, and TMO were the only tenants of the office building.

Each company applied for its first occupancy tax credit in 2021, received approval in 2022, and sold the credit in 2022 or 2023. CSB sold its credit for $7,933,677.84, NFI for $7,186,923.32, and TMO for $7,026,943.29. Each firm has "the right to seek Grow [NJ] tax credits for each year up to and including

34

the 2030 calendar year." As of the return date of the indictment, CSB, NFI, and TMO "received a total of at least $29 million" in credits.

11 Cooper was constructed by TMO and owned by CP Residential GSGZ (CP Residential), which was owned by limited liability companies "that include [George], [Brown], and [O'Donnell] as part of their ownership." CP Residential applied for its first ERG tax credit for 11 Cooper in February 2022, received the award in June 2022, and sold the credit in July 2022 for $2,179,220.

In paragraphs 173 through 180, in a section titled "CFP CEO-1 Resigns From CFP Under Threat of False Reputational Harm," the indictment described allegations against the Enterprise members and associates for conduct occurring in 2017, pertaining to CFP CEO-1. Specifically, in mid-2017, CFP CEO-1 met with the then co-president and CEO of Cooper Health (Individual-2) and another person. Individual-2 reported George "wanted to move people around in Camden" and "disapproved of CFP CEO-1['s] remaining" in his position. CFP CEO-1 responded "he was happy in his position and was not looking to leave."

In December 2017, CC-1 told CFP CEO-1 that Redd "needed a place to go as her term as mayor was ending" and predicted: Redd would replace the current CEO (Individual-1) of the Rowan University/Rutgers Camden Board of Governors (Rowan/Rutgers Board); Individual-1 would assume CFP CEO's

A-1833-24

position; and CFP CEO-1 would be offered a position with the Camden County Improvement Authority (CCIA). "CC-1 also told CFP CEO-1 that she needed him to resign." Because resignation would cause CFP CEO-1 to forfeit his bonus and any severance, and the CCIA position would pay "nearly $100,000 less than his current position," CFP CEO-1 protested. CC-1 responded, "Tambussi had looked at CFP CEO-1's contract and said they could 'drive a truck through it.'" CC-1 further stated if CFP CEO-1 did not resign, "'they' would just make something up about him, which would lead to hi[s] being terminated for cause."

CFP CEO-1 attempted to negotiate his exit, asking CC-1 to "restructure" his severance package to give CC-1 "cover." CC-1 replied restructuring would not give her "cover with George" and said "you don't want that fight." CC-1 further stated, "If you don't think that he can't get to anybody he wants to, you're kidding yourself . . . He has been relentless with me for the last year about why we pay you so much money." CFP CEO-1 therefore "agreed to resign from CFP at of the end of 2017" and was replaced by Individual-1. In turn, Individual-1 was replaced by Redd as CEO of the Rowan/Rutgers Board.

3. Radio Lofts

A-1833-24

In paragraphs 181 through 197, the indictment included allegations pertaining to the Enterprise's "Point of Attack" to remove "Developer-1's option to redevelop the Radio Lofts building." Under sections titled, "Camden Officials Follow the Norcross Enterprise's Plan" and "The Enterprise Causes Developer-1 to Give Up His Radio Lofts Rights," the indictment related the Enterprise's conduct.

Around December 2017, Developer-1 agreed to sell six DPI properties, including Victor Lofts and its PILOT program, to a real estate investment trust (REIT). The sale of the PILOT agreement required the City Council's approval.

During a stakeholder meeting in March 2018, Philip suggested to "City officials, including the City Attorney," and a CRA official that "the Victor PILOT agreement transfer approval should be slowed down by the City in order to create a 'legal strategy' to deal with Developer-1's Camden interests." Philip further stated the "Victor PILOT agreement should be treated as a 'package deal'" with DPI's Radio Lofts development options. Philip said, "the purpose of slowing down the Victor PILOT agreement transfer approval was to cause Developer-1 to forfeit DPI's option to redevelop Radio Lofts."

Also in March 2018, the CRA's executive director emailed Individual-1, the new CFP CEO, and Lawyer-1, inquiring "how the CRA might 'unwind'

37

Developer-1's rights to the Radio Lofts site." By March 28, 2018, the CRA "prepared a draft letter purporting to terminate DPI's option agreement to purchase Radio Lofts." On April 11, the plan was presented to the CRA board, on April 13, REIT filed the application to transfer DPI's PILOT agreement, and on April 20, the CRA sent DPI a letter "purporting to terminate its Radio Lofts redevelopment option."

As of June 2018, DPI and REIT were unable to obtain information about the PILOT transfer request. In response, DPI filed a lawsuit against the City, the CRA, and their representatives. Tambussi, among other attorneys, represented the CRA and the City. In response to the lawsuit, Philip provided Tambussi "talking points," including "assertions that Developer-1 was responsible for the failure to redevelop Radio Lofts and that the City of Camden 'will not be bullied or intimidated' by Developer-1's litigation tactics." Those points were repeated by the City attorney to REIT concerning "the stalled transfer of the PILOT agreement." The indictment stated the City filed a countersuit, without asserting the specific claims.

Developer-1 moved pretrial to admit evidence that the opposing parties "became adversarial to him beginning in 2016, while he was negotiating with members and associates of the Norcross Enterprise." Tambussi filed an

A-1833-24

opposing motion to "preclude any reference" to George and Philip in the lawsuit. During oral argument, Tambussi argued George and Philip were not parties to the view easement transaction between LPT and Developer-1. The indictment alleged conversely, the transaction "was consummated" at Philip's insistence "through a four-party agreement among DPI; LPT; Camden Partners Land LLC (an entity associated with [George, Brown, and O'Donnell]); and TMO."

In September 2023, the parties settled their claims. Developer-1 released his Radio Lofts redevelopment option to the City, "sold a parking lot to the City for $1," and agreed to pay the City $3.3 million. Developer-1 agreed to the settlement even though he felt "he was in the right." The indictment explained Developer-1 was concerned about "corruption" in the City, "which made him believe that he would not be treated fairly by the court system, he had already expended considerable funds on legal fees, and, even if he were successful, pending appeals would interfere with his ability to refinance or sell the Victor." The indictment alleged "as a result of the plan to delay approval of the Victor PILOT agreement transfer, the Norcross Enterprise successfully caused Developer-1 to forfeit his Radio Lofts development option."

In paragraphs 198 through 211, the indictment detailed the personal benefits received by the Enterprise members and entities. Those benefits included tax credits, wages, and enhancement of the Enterprise's political power.

II. The Indictment's Charging Language

The indictment's thirteen counts and forfeiture provision comprised the remainder of the charging instrument. Pertinent to this appeal, the racketeering conspiracy charged in count one asserted nine "objects and purposes of the [E]nterprise," including the "means" of achieving the same:

> a. Preserving, protecting, promoting, and enhancing the power, reputation, and profits of the Enterprise and its members and associates;
>
> b. Preserving, protecting, promoting, and enhancing the reputation and political power of [George], who was the leader of the Enterprise, through the use of various means, including controlling endorsements and access to the local political party apparatus, directing appointments to government positions, intimidating political opponents, using its influence and control over government agencies to cause opponents to lose government contracts;
>
> c. Enriching and rewarding members, allies, and associates of the Enterprise, including with political endorsements, appointments to public positions, influencing government contracts, and placement in lucrative private sector jobs;
>
> d. Influencing the New Jersey Legislature, which sits in Trenton, New Jersey, to pass the EOA in 2013 in a

40

manner that greatly increased tax credit awards for projects in Camden and was tailor made to advance the interests of the Enterprise;

e. Obtaining Grow NJ and ERG tax credits over a 10-year period, beginning with the acquisition of the tax credits through applications to the EDA by the Enterprise members and associates and their associated firms, and by other means, and which, according to the Enterprise's plan, would be received during that 10-year period through annual certifications to the EDA;

f. Using the tax credits to pay for a building or buildings in Camden, which would be occupied by certain of the Enterprise members' firms, and firms associated with Enterprise members, and to cover the costs of Camden property occupied by firms associated with Enterprise members, so that costs expended in planning, constructing, or occupying such property would be offset by the application or sale of the tax credits;

g. Concealing, misrepresenting, and hiding the illegal operation of the Enterprise and acts done in furtherance of the Enterprise from the public and law enforcement, for the purpose of advancing the objectives of the Enterprise, including by misleading the public, law enforcement, the news media, and others into believing that the acquisition and sale of the tax credits stemmed from purely lawful activity, and thus avoiding attempts by the State to recapture the value of awarded tax credits;

h. Promoting compliance with the Enterprise's demands by retaliating against those in the way of and opposed to the Enterprise; and

i. Using the Enterprise's reputation for controlling governmental entities to intimidate and threaten those who held property interests that the Enterprise wanted to acquire, including in order to apply for, and receive, Grow NJ and ERG tax credit awards.

In count two, conspiracy regarding the L3 Complex, the indictment alleged, George, Philip, Redd, and Tambussi agreed, in pertinent part, to commit:

(1) theft by extortion of CFP's property

by purposely threatening: (1) to take and withhold action as an official and cause an official to take and withhold action; and (2) to inflict a harm which would not substantially benefit . . . defendants, but which was calculated to materially harm [CFP], contrary to the provisions of N.J.S.A. 2C:20-5;

(2) criminal coercion by agreeing to

[k]nowingly . . . threaten[ing] to: 1) take and withhold action as an official and cause an official to take and withhold action; and 2) to perform an act which would not in itself substantially benefit . . . defendants but which was calculated to substantially harm [CFP] and CFP CEO-1 with respect to their business, career, financial condition, and reputation, with purpose to unlawfully restrict CFP CEO-1's and [CFP]'s freedom of action from engaging in conduct and refraining from engaging in conduct, including, their choice in a developer, contrary to the provisions of N.J.S.A. 2C:13-5; [and]

(3) official misconduct

42

in that [Redd], acting with the purpose to obtain a benefit for herself and another in excess of $200 and to injure another and deprive another of a benefit, did commit an act relating to her office but constituting an unauthorized exercise of her official functions, knowing that such act was committed in an unauthorized manner, that is, [Redd] then and there being a public servant, to wit, Mayor of the City of Camden, having thereby the official functions and duties, among others, to perform the duties of the office impartially, to supervise all of the departments of the City government, to supervise and direct all necessary public city functions, to conduct business according to the highest ethical standards of public service, to devote her best efforts to the interests of the city, to perform her duties in a legal and proper manner, to display good faith, honesty and integrity, and to be impervious to corrupting influences, did commit the acts described in Counts 1, 7, 8, 11, and the preceding sections of Count 2 of this Indictment, contrary to the provisions of N.J.S.A. 2C:30-2.

Count three, conspiracy regarding the Triad1828 Centre and 11 Cooper, contained substantially similar charging language as count two on the criminal coercion and official misconduct offenses. As to theft by extortion, the indictment charged all defendants agreed to obtain DPI's and Developer-1's

view easement, right of first refusal, residential development rights, and tax credits, by purposely threatening to: 1) publicize any asserted fact, whether true or false, tending to subject any person to hatred, contempt and ridicule, and to impair his credit and business repute; 2) take and withhold action as an official and cause an official to take and withhold action; and 3) inflict a harm which would not

43

substantially benefit . . . defendants, but which was calculated to materially harm [DPI] and Developer-1, contrary to the provisions of N.J.S.A. 2C:20-5.

Count four, conspiracy regarding Radio Lofts, charged George, Philip, and Tambussi, agreed to commit theft by extortion and criminal coercion offenses; count four did not allege official misconduct. More particularly, as to theft by extortion, count four alleged George, Philip, and Tambussi agreed to:

> Purposely and unlawfully . . . obtain by extortion property of [DPI], that is, property and development rights related to the Radio Lofts building, by purposely threatening to: 1) publicize any asserted fact, whether true or false, tending to subject any person to hatred, contempt and ridicule, and to impair his credit and business repute; 2) take and withhold action as an official and cause an official to take and withhold action; and 3) inflict a harm which would not substantially benefit . . . defendants, but which is calculated to materially harm [DPI] and Developer-1, contrary to the provisions of N.J.S.A. 2C:20-5.

As to criminal coercion, count four alleged George, Philip, and Tambussi agreed to:

> Knowingly . . . threaten to cause an official to take and withhold action, and perform any other act[, which] would not in itself substantially benefit . . . defendants but which was calculated to substantially harm [DPI] and Developer-1 with respect to their business, career, financial condition, and reputation, with purpose to unlawfully restrict [DPI]'s and Developer-l's freedom of action from engaging in conduct, contrary to the provisions of N.J.S.A. 2C:13-5.

44

The remaining counts largely tracked the language of the underlying statutes.

III.  Governing Legal Principles - Indictments

"Under the New Jersey Constitution, no defendant may be compelled to stand trial for a crime unless the State first presents the matter to a grand jury and an indictment is returned." State v. Morrison, 188 N.J. 2, 12 (2006) (citing N.J. Const. art. I, ¶ 8).  The grand jury is thus assigned the "constitutional role of standing between citizens and the state." State v. Del Fino, 100 N.J. 154, 164 (1985).  "[A]n indictment's 'primary purpose' is to enable a defendant to prepare a defense by adequately describing the offense charged." State v. Jeannotte-Rodriguez, 469 N.J. Super. 69, 103 (App. Div. 2021) (quoting State v. Rios, 17 N.J. 572, 603 (1955)).

Rule 3:7-3 prescribes certain requirements for an indictment's "[n]ature and [c]ontents."  An indictment "shall be a written statement of the essential facts constituting the crime charged." R. 3:7-3(a).  "It may be alleged in a single count either that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specific means." Ibid.  "Allegations made in one count of the indictment . . . may be incorporated by reference in another count." Ibid.  Thus, when reviewing an indictment, a

court must review the document in its entirety, with each part informing the others.  See State v. Wein, 80 N.J. 491, 499 (1979).

A speaking indictment, unlike a conventional indictment, is more detailed. Although our courts have not addressed speaking indictments, let alone facial challenges to such indictments, federal courts have done so.  See, e.g. United States v. Sittenfeld, 522 F. Supp. 3d 353, 366 (S.D. Ohio 2021) (undertaking a facial challenge to a speaking indictment and recognizing the lack "of any authority [anywhere] that explicitly recognizes" a "distinction between a 'speaking indictment' and a 'non-speaking indictment'").[13]

A defendant may move to dismiss an indictment pursuant to Rule 3:10-2. But a defendant challenging an indictment faces a "heavy burden."  State v. Graham, 284 N.J. Super. 413, 417 (App. Div. 1995).  That is because "[a]n indictment is presumed valid," State v. Feliciano, 224 N.J. 351, 380 (2016), and "should be disturbed only on 'the clearest and plainest ground,' and only when

---

[13]   Speaking indictments are more prevalent in federal court, but they are not without controversy.  See Alberto Bernabe-Riefkohl, Silence is Golden:  The New Illinois Rules of Attorney Extrajudicial Speech, 33 Loyola Univ. Chi. L.J. 323, 373 (2002) (positing speaking indictments stand in for press conferences, allowing prosecutors to state everything they "would want to say in pretrial publicity in glorification of the case and in condemnation of the defendant" (quoting Monroe H. Freedman, Understanding Lawyers' Ethics, 233 (1990))).

A-1833-24

the indictment is manifestly deficient or palpably defective." State v. Hogan, 144 N.J. 216, 228-29 (1996) (quoting State v. Perry, 124 N.J. 128, 168 (1991)).

"The test of validity is whether the indictment in reasonably understandable language charges the defendant with commission of the essential factual ingredients of the offense." State v. Silverstein, 41 N.J. 203, 207 (1963); see also R. 3:7-3(a). Stated another way, "if an indictment alleges all the essential facts of the crime, the charge is sufficiently stated and the indictment should not be dismissed unless its insufficiency is 'palpable.'" State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 19 (1984); see also State v. Twiggs, 233 N.J. 513, 531-32 (2018). Sufficient specificity is necessary "to preclude the substitution by a trial jury of an offense which the grand jury did not in fact consider or charge." State v. LeFurge, 101 N.J. 404, 415 (1986) (quoting State v. Boratto, 80 N.J. 506, 519 (1979)). "[W]here the statute of limitations has run," an indictment is deemed palpably defective. State v. Winne, 12 N.J. 152, 182 (1953).

Ordinarily, an appellate court reviews a trial court's decision on a motion to dismiss an indictment for abuse of discretion. Saavedra, 222 N.J. at 55 (2015). However, appellate courts "review a trial court's decision to dismiss an indictment de novo" when "it did not involve 'a challenge to fact-finding on the

part of the trial court.'" S.B., 230 N.J. at 67 (quoting State v. Cagno, 211 N.J. 488, 505 (2012)). We therefore conduct a de novo review of issues concerning statutory construction, including the meaning of a statute's terms. See State v. Olivero, 221 N.J. 632, 638 (2015); see also State v. Bernardi, 456 N.J. Super. 176, 186 (App. Div. 2018) (recognizing appellate courts review de novo a trial court's decision on a motion to dismiss an indictment "based on the court's interpretation of the statutes pursuant to which [the] defendant was charged"). Our review is de novo in the present matter because the motion court determined the facts alleged in the indictment, "d[id] not constitute a crime . . . as a matter of law" pursuant to the governing statutes and were time-barred under the applicable statutes of limitations.

### A. Procedural Review

As a threshold matter, the State argues the motion court improperly penalized the prosecution and the grand jury by subjecting the detailed speaking indictment to an elevated standard of review – dubbing it a "sufficiency-of-the-evidence-on-the-face-of-the-indictment" test. Specifically, the State claims the court inquired "whether there was sufficient evidence cited in the [i]ndictment itself, without reviewing the reams of testimony and exhibits the grand jury saw." The State maintains the present indictment is supported by the evidence

presented to the grand jury and does not lend itself to a facial review as would a conventional barebones indictment. The State further asserts the complexity of the offenses charged implicated questions of fact on issues such as intent and motive and, as such, defendants' challenges were ill-suited for pretrial resolution, particularly without the color and context provided by the full grand jury record.

In its decision, the court recognized most dismissal motions require trial courts to review the "entire grand jury proceedings." Noting the State chose to proceed via the "fairly rare" speaking indictment, the court found that option did not "change the standards governing a motion to dismiss." The court acknowledged the indictment did not constitute "a full proffer of the State's case," but essentially found its nature and contents "open[ed] the door to the facial challenge" brought by defendants.

The court was persuaded defendants' "purely legal" facial challenge was appropriate for its review because defendants did not cite the grand jury record, assumed the truth of the indictment's allegations, and assumed all allegations "w[ere] adequately supported before the grand jury."[14] The court thus framed

---

[14] In its merits brief, the State notes the court therefore "did not consider the portions of Tambussi's brief that cited the grand[ ]jury transcripts and evidence, and the State did not respond to them."

defendants' argument as suggesting all essential facts of the offenses were detailed in the indictment, and "those facts, accepted as true and construed in the most favorable way to the State, d[id] not constitute a crime . . . as a matter of law." Defendants thus contended "the indictment [wa]s manifestly deficient and facially and palpably defective."

A facial challenge to an indictment is permissible provided the court's review is limited to the legal sufficiency of the allegations, that is, whether the allegations constitute an offense. See State v. Mason, 355 N.J. Super. 296, 299 (App. Div. 2002) (recognizing "where the indictment is factually unsupported either on its face or in the grand jury proceedings, the dismissal is appropriate"). Facial sufficiency motions are well-established in our jurisprudence.

For example, in State v. Thompson, 402 N.J. Super. 177, 181 (App. Div. 2008), the indictment charged thirty-six counts of official misconduct and related charges. The majority of these counts concerned the acceptance of gifts by public officials from a vendor engaged in public bidding. Id. at 182-83. The State alleged by failing to abide by their organization's code of conduct, which forbade accepting gifts, the employees "refrain[ed] from performing an official duty with a purpose to obtain a benefit." Id. at 184.

The trial court in <u>Thompson</u> dismissed the official misconduct and related charges "based upon legal insufficiency" and thus did not "reach defendants' arguments that the evidence presented to the grand jury was factually insufficient." <u>Id.</u> at 182. We affirmed, holding the ethics violations "standing alone" did not provide a basis for the charges. <u>Id.</u> at 201. We therefore concluded the charges stemming from the ethics violations alone were properly dismissed. <u>Id.</u> at 204.

<u>Thompson</u> is not an outlier. Seventy-five years ago, in <u>De Vita</u>, this court considered a pre-code indictment alleging the defendant "did unlawfully, corruptly and wickedly entice, solicit and persuade [another] to abandon, withdraw and alter his testimony," construed by the trial court as charging suborning or attempting to suborn perjury. 6 N.J. Super. at 346. We rejected the State's argument that the indictment's terms implied the defendant wished to extract false testimony. <u>Ibid.</u> Concluding the text did not allege that fact, we reversed the court's decision and dismissed the indictment. <u>Ibid.</u> Much more recently, in <u>Jeannotte-Rodriguez</u>, we upheld the dismissal of an indictment concluding, in part, "[t]he trial court did not abuse its discretion in dismissing the indictment on the grounds it omitted sufficient detail to enable [the] defendants to defend." 469 N.J. Super. at 104; <u>see also</u> <u>R.</u> 3:10-2(d) (permitting

dismissal motions where the defendant alleges "the indictment . . . fails to charge an offense").

Measured against these standards, we discern no error in the motion court's decision to conduct a facial review of the speaking indictment here. Our state has long permitted facial challenges to the sufficiency of an indictment, requiring the court to accept the truth of the indictment's allegations and decide whether only those allegations constitute all elements of the offenses charged. A facial review does not, however, permit a court to assess the evidentiary strength of the State's case.

The parties have not provided, and our research has not disclosed, any authority prohibiting a court from entertaining a facial sufficiency challenge to a speaking indictment simply because it is a speaking indictment, or reviewing the entire indictment in the process. Indeed, our Supreme Court has long recognized the court's obligation to review the indictment in its entirety. See Wein, 80 N.J. at 499. Although a motion court must not review the indictment as though it were a complete statement of the State's evidence, there is no reason a court should not pass judgment on the legal theories embodied in the indictment. This approach is administrable, equitable, complies with existing case law, and accords proper respect to the grand jury's role. If the theories of

52

culpability embodied in the indictment do not constitute a crime on their face, the court should dismiss the indictment. See State v. Dorn, 233 N.J. 81, 93-94 (2018) (explaining "an indictment must allege all the essential facts of the crime," and "specify" "every element" (first quoting LeFurge, 101 N.J. at 418; and then quoting State v. Fortin, 178 N.J. 540, 633 (2004))); see also R. 3:7-3(a). Accordingly, we conclude the motion court correctly conducted a facial review of the indictment here.

B. Substantive Review:
   Statutes of Limitations and Validity of Charges

We turn to the State's challenges to the substance of the motion court's decision. The State argues the court failed in its stated task and did not accept the truth of the indictment's allegations and their reasonable inferences. Guided by the tenor of defendants' arguments, the court's decision focused on the absence of any alleged facts supporting the offenses charged. Distilled to its essence, the court was persuaded overall that the facts alleged nothing more than non-criminal "hard bargaining."

The court also found the offenses charged were time-barred. Because a criminal charge filed beyond the statute of limitations "is tantamount to an absolute bar to the prosecution of the offense," State v. Short, 131 N.J. 47, 55

A-1833-24

(1993), and renders the indictment palpably defective, Winne, 12 N.J. at 181-82, we first consider the statutes of limitations pertaining to the present charges.

The State reiterates the motion court, in its purported facial review, failed to accept as true the durations of the offenses as alleged in the indictment and further erred by finding the offenses terminated around the time the development deals were completed. According to the State, certain offenses are ongoing and will continue until all tax credits associated with the redevelopments are received; other offenses continued beyond the limitations periods because the Enterprise members committed acts of concealment or "promot[ed] compliance" through intimidation and other tactics. The State maintains the end dates, if any, were questions of fact for the jury.

"A criminal statute of limitations is designed to protect individuals from charges when the basic facts have become obscured by time." State v. Diorio, 216 N.J. 598, 612 (2014). "A statute of limitations balances the right of the public to have persons who commit criminal offenses charged, tried, and sanctioned with the right of the defendant to a prompt prosecution." Ibid. Critically, such statutes "protect a defendant 'from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." State v. Rosado, 475 N.J. Super. 266, 273 (App. Div. 2023) (quoting

State v. Thompson, 250 N.J. 556, 573 (2022)). They "provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." Twiggs, 233 N.J. at 534 (quoting United States v. Marion, 404 U.S. 307, 322 (1971)).

"Courts are bound to the statute of limitations and 'cannot unilaterally nullify [its] protections.'" Ibid. (alteration in original) (quoting Short, 131 N.J. at 55). Moreover, the "statute of limitations is not intended to assist the State in its investigations; it is intended to protect a defendant's ability to sustain his or her defense." Id. at 539. Thus, where the State does not commence prosecution within the relevant timeframe, the statute of limitations is a complete defense and bar to prosecution. Thompson, 250 N.J. at 573.

As it relates to the date of accrual for a statute of limitations, N.J.S.A. 2C:1-6(c) states, in pertinent part: "An offense is committed either when every element occurs or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated." Thus, for continuing offenses, defined as "conduct spanning an extended period of time," which "generates harm that continues uninterrupted until the course of conduct ceases," Diorio,

216 N.J. at 614, the statute of limitations "does not begin to run until the prohibited conduct ceases." Id. at 602.

N.J.S.A. 2C:1-6(b)(1) provides, in most cases, "prosecution for a crime must be commenced within five years after it is committed." N.J.S.A. 2C:1-6(b)(3) provides that official misconduct, among other crimes, must be prosecuted within seven years after its commission. "Prosecution is commenced when an indictment is returned." State v. Coven, 405 N.J. Super. 266, 272 (App. Div. 2009) (citing N.J.S.A. 2C:1-6(d)). As the motion court explained, in this case, to comply with the applicable statutes of limitations, most of the charges must have continued after June 13, 2019, except the official misconduct charges, which must have continued after June 13, 2017.

## 1. RICO and General Conspiracies

The RICO and general conspiracies charged in the indictment are continuing offenses. Cagno, 211 N.J. at 509 (RICO); Twiggs, 233 N.J. at 543 (conspiracy). Accordingly, a conspiracy terminates only when either "the crime or crimes which are its object are committed or the agreement that they be committed is abandoned by the defendant and by those with whom he [or she] conspired." N.J.S.A. 2C:5-2(f)(1); see also Cagno, 211 N.J. at 509-10.

In its decision, the motion court characterized the indictment's statements concerning the timeframe, and the Enterprise's purposes, as "allegations, assertions, and, ultimately, conclusions" – "not facts." The judge was persuaded "many critical events occurred prior to June 13, 2019." Following its summary of those events described in the indictment, the court determined "[a]ny extortion to obtain property was complete by 2019." The court rejected the State's contentions that the RICO conspiracy was extended by defendants' ongoing tax credit awards; "promoting compliance with the Enterprise's demands" through intimidation and retaliation; and "concealing the illegal activities of the Enterprise."

On appeal, the State reprises the same arguments.[15] We consider these contentions seriatim.

### a. Tax Credits

The motion court held the tax credits were not criminal proceeds, the receipt of which would have extended the statutes of limitations. The judge reasoned the indictment neither alleged "any business sought or received tax credits for which it was not eligible" nor "fraud in the application process."

---

[15] The State asserts the general conspiracy offenses, charged in counts two through four, are timely in much the same manner as the RICO conspiracy.

A-1833-24

Because the tax credits were properly awarded, the court found their annual distribution did not extend the time frame of the conspiracy. Citing federal case law, the court was persuaded "a conspiracy for economic gain does not continue until the accomplishment of the conspiracy's economic objectives if those economic objectives are achieved through the receipt of serial payments that are 'lengthy, indefinite, ordinary . . . noncriminal and unilateral.'" See United States v. Grimm, 738 F.3d 498, 503 (2d Cir. 2013); see also United States v. Doherty, 867 F.2d 47, 61 (1st Cir. 1989).

Again, we are confronted with an issue in this matter where the court and the parties have not cited, and our research has not revealed, controlling authority. Indeed, New Jersey law does not specifically articulate a framework for analyzing ongoing payments to extend a conspiracy. On appeal, the parties again address the issue through the lens of the Doherty/Grimm doctrine. The State asserts the tax credits were a "central objective" of the conspiracy and thus necessarily extend its life. Defendants counter under the Doherty/Grimm doctrine, which they contend is consistent with New Jersey law, the long-term, recurring award of tax credits cannot extend the life of a conspiracy. George expressly argues to rule otherwise would "make every financial crime a perpetual offense, thereby defeating the very purpose of a statute of limitations."

In Doherty, the government alleged a conspiracy among several public employees to steal, sell, and share an upcoming civil service examination for promotion purposes. 867 F.2d at 51. The indictment asserted one of the conspiracy's goals was to secure benefits including increased salary payments. Id. at 56. The government argued the employees' salaries were the payoff of the conspiracy, extending the statute of limitations as long as they were received. Id. at 61.

The court in Doherty disagreed, cautioning that approach "would for all practical purposes wipe out the statute of limitations in [these kinds of] conspiracy cases." Id. at 62 (quoting Grunewald v. United States, 353 U.S. 391, 402 (1957)). The court elaborated:

> [W]here receiving the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, and there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues. Rather, in these latter circumstances, one would ordinarily view the receipt of payments merely as the "result" of the conspiracy.
>
> [Id. at 61.]

In Grimm, the defendants were indicted for conspiracy to commit wire fraud in a bond manipulation scheme. 738 F.3d at 500. In response to the

59

defendants' motion to dismiss the indictment, "the district court dismissed the wire fraud charge because the government had not alleged any activity within the five-year limitations period, but declined to dismiss the conspiracy charges, holding that the alleged conspiracies continued as long as [the] unindicted co-conspirators . . . made interest payments on the [contracts at issue]." Id. at 501.

The Second Circuit reversed, clarifying the Doherty criteria. Id. at 504. The court reasoned, "'[i]ndefinite' cannot mean 'without end.'" Id. at 503. Rather, "[p]ayments can be 'indefinite' either in the sense that they are of undetermined number or in the sense that they are prolonged beyond the near future." Ibid. The court therefore held when "anticipated economic benefit continues, in a regular and ordinary course, well beyond the period 'when the unique threats to society posed by a conspiracy are present,'" those benefits are "the result of a completed conspiracy" and "'[t]hough the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one.'" Id. at 503-04 (first quoting Doherty, 867 F.2d at 62; and then quoting Fiswick v. United States, 329 U.S. 211, 216 (1946)).

Although the Doherty/Grimm doctrine is not binding authority, we are persuaded its rationale applies to the long-term, recurring receipt of tax credits. We are particularly concerned that an alternative conclusion would render the

60

statute of limitations a mere form of words when applied to certain conspiracy prosecutions. Doherty, 867 F.2d at 62; see also Grunewald, 353 U.S. at 402. We therefore adopt the doctrine and bar the perpetual award of tax credits to extend the life of a conspiracy.

Applying the Doherty/Grimm doctrine here, we accept at face value for purposes of this analysis, the first count of the indictment alleged one of the "objects and purposes" of the Enterprise was "[o]btaining Grow NJ and ERG tax credits over a 10-year period," which would be utilized "to pay for a building or buildings in Camden" occupied by firms of the Enterprise and its associates.[16] Notably, however, that object and purpose was similar in nature to the increase of salary payments goal asserted in the Doherty indictment as they constituted "the 'result' of the conspiracy," Doherty, 867 F.2d at 61, and were prolonged "beyond the near future," Grimm, 738 F.3d at 503. We are therefore persuaded the same factors underpinning the holdings in Doherty and Grimm – particularly the long-term, recurring payments marked by no independent illegality – support

---

[16] In addition, the specific factual allegations suggested the tax credits were not the ultimate goal of the conspiracies. As one notable example, the indictment alleged that George stated, in 2012 or 2013, "he wanted to be able to use the new legislation to construct an office building for free." On its face, this statement suggested the tax credits were a tool to achieve the true goal of the enterprise: the redevelopment projects.

61

the motion court's conclusion that, with the completion of the redevelopment deals, the objects of the conspiracies were concluded. See N.J.S.A. 2C:5-2(f)(1); see also Cagno, 211 N.J. at 509-10. We therefore reject the State's renewed contention that the receipt of tax credits extended the RICO and general conspiracies.

### b. Concealment

We turn to the State's contention that "[d]efendants engaged in alleged acts of concealment during and after October 2019" by making certain statements. Citing Twiggs, 233 N.J. at 543, the motion court recognized these statements were, at most, "mere overt acts of concealment," but found they lacked the requisite "nexus, even inferential, between these statements and an effort to keep the conspiracy active after the accomplishment of its core objectives."

Under certain circumstances, acts of concealment that "have significance in furthering a criminal conspiracy" can extend the applicable statute of limitations. Grunewald, 353 U.S. at 405. However, the Supreme Courts of the United States and New Jersey have emphasized the "'vital distinction' 'between acts of concealment done in furtherance of the main criminal objectives of the conspiracy,' which extend the conspiracy and toll the statute of limitations, and

'acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.'" Twiggs, 233 N.J. at 544 (quoting Grunewald, 353 U.S. at 405). Thus, after the conspiracy's "central criminal purposes" are accomplished, "a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." Ibid. (quoting Grunewald, 353 U.S. at 401-02).

A contrary rule "would for all practical purposes wipe out the statute of limitations in conspiracy cases." Grunewald, 353 U.S. at 402; see also Twiggs, 233 N.J. at 544. Accordingly, "prosecutors cannot 'extend the life of a conspiracy indefinitely' by inferring a conspiracy to conceal 'from mere overt acts of concealment.'" Twiggs, 233 N.J. at 543 (quoting Grunewald, 353 U.S. at 402). Instead, courts have required "an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." Ibid. (quoting Grunewald, 353 U.S. at 404).

The indictment in this case did not assert such an agreement, nor would the alleged acts of concealment accomplish that purpose. Initially, the

A-1833-24

indictment identified a series of three media reports made between 2019 and 2022 that allegedly skew the facts around the L3 deal, implying CFP was out of its league in the "redevelopment and management of a large[-]scale property," and Cooper Health was its heroic savior by "salvag[ing] the sale of the property." Of the three reports, only one is attributed to a member of the conspiracy. Tambussi allegedly told a reporter, during a recorded call with George on the line, "CFP couldn't 'do the deal'" for the L3 Complex and, on behalf of Cooper Health, its CEO "unilaterally agreed to a long-term lease . . . at an inflated rate."

Other examples of concealment identified in the indictment involved Tambussi's litigation of the Radio Lofts case on behalf of CRA. The indictment cited Tambussi's never-decided motion to preclude reference to George and Philip, and Tambussi's statement, during argument on the motion, that the view easement deal was between Developer-1 and LPT.

However, the indictment did not allege any facts indicating an "agreement . . . to continue to act in concert in order to cover up" an offense. See Twiggs, 233 N.J. at 544 (quoting Grunewald, 353 U.S. at 404). As the motion court found, the asserted conduct was, at worst, "acts of concealment done after these

central objectives ha[d] been attained" and thus did not extend the statute of limitations.  See ibid. (quoting Grunewald, 353 U.S. at 405).[17]

### c.  Promoting Compliance

Nor are we persuaded by the State's renewed argument that the RICO conspiracy's objective of "promoting compliance" through intimidation and similar tactics extended the limitations period.  To support its argument, the State references the 2018-23 litigation between the City, CRA, and Developer-1, but cites no authority in support of its contention.  Because we conclude the RICO and general conspiracies ended with the completion of the redevelopment deals, we find insufficient merit in the State's promoting compliance argument to warrant further discussion.  R. 2:11-3(e)(2).

### 2.  Radio Lofts Conspiracy Exception

We reach a different conclusion, however, regarding the timeliness of the conspiracy alleged in count four.  This count essentially asserted between

---

[17]  It is not lost on us that labeling these statements as acts of concealment was not particularly plausible as they appear to be at cross purposes.  Although Tambussi's media commentary on the L3 Complex exaggerated Cooper Health's role, his efforts in the Radio Lofts litigation sought to minimize the presence of George and Philip.  Moreover, the indictment made clear their association and role in the redevelopment projects were no secret, as evidenced by their appearance alongside the then governor and others at the redevelopment launch press conference.

October 1, 2016 and October 31, 2023, George, Philip, and Tambussi agreed to: "obtain by extortion property of [DPI], that is, property and development rights related to the Radio Lofts building"; and "threaten to cause an official to take or withhold action . . . to unlawfully restrict [DPI]'s and Developer-1's freedom of action from engaging in [coercive] conduct." Assuming, without initially deciding the indictment alleged a criminal offense, the prosecution of the conspiracy, as asserted, was timely commenced.

As stated above, a conspiracy persists until "the crime or crimes which are its object are committed." N.J.S.A. 2C:5-2(f)(1). Extortion requires, as an element, that the defendant "obtains property." N.J.S.A. 2C:20-5. As charged in count four, criminal coercion, as an element, required George, Philip, and Tambussi to obtain property from Developer-1 by "threaten[ing] to cause an official to take or withhold action." Developer-1 did not surrender his rights to Radio Lofts until 2023. Pursuant to our holding that the general conspiracies ended when the redevelopment deals were completed, we conclude count four, on its face, asserted a timely conspiracy because the limitations period was extended through and including the 2023 date of the Radio Lofts closing. We therefore turn to the validity of the Radio Lofts conspiracy charge.

The State generally argues "the [i]ndictment validly charge[d] conspiracies to extort and coerce through threats of government and reputational harm." In view of our decision that all counts, except for count four, failed to charge timely conspiracies, we confine our review to the Radio Lofts conspiracy.

In its merits brief, the State claims, "[b]etween 2018 and 2023, [d]efendants worked together to use their control over [the] Camden government to leverage Developer-1's interests in the Radio Lofts and Victor Lofts properties." The State maintains Philip "instructed local officials to slow down the approval" of Developer-1's PILOT transfer "and treat it as a 'package deal' with Developer-1's option to redevelop Radio Lofts." In doing so, Philip allegedly said, "the purpose of linking the two interests was to cause Developer-1 to forfeit his Radio Lofts redevelopment option, which George . . . had earlier identified as 'another point of attack on' Developer-1." According to the State, as a result of Philip's instruction, "the City withheld approval for the PILOT transfer" and "the CRA moved to terminate Developer-1's option agreement to redevelop Radio Lofts." The State further contends, in response, Developer-1 filed the 2018 litigation "against the City, CRA, and related officials" and ultimately settled the litigation even though he "believe[d] he was in the right."

George counters the indictment failed to assert any Norcross Enterprise member threatened Developer-1, invalidating any claim of extortion or criminal coercion that could support the conspiracy charge. Further, no member of the Enterprise acquired Developer-1's rights to Radio Lofts. Philip contends there is no allegation in the indictment that the statements attributed to him "were communicated or intended to be communicated to [Developer-1]."

N.J.S.A. 2C:5-2(a) defines conspiracy as follows:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he [or she]:
>
> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

An "agreement to commit a specific crime is at the heart" of the conspiracy statute. State v. Samuels, 189 N.J. 236, 245 (2007). The State must prove the defendant either agreed with another to engage in criminal conduct or agreed to aid the other in planning or committing the crime. N.J.S.A. 2C:5-2(a). "The mere knowledge, acquiescence, or approval of the substantive offense, without

an agreement to cooperate, is not enough to establish one as a participant in a conspiracy." State v. Abrams, 256 N.J. Super. 390, 401 (App. Div. 1992).

Rather, the defendant must have "intentional[ly] participat[ed] in the activity with a goal of furthering the common purpose." Ibid.; see also Model Jury Charges (Criminal), "Conspiracy (N.J.S.A. 2C:5-2)" at 1 (rev. Apr. 12, 2010) (instructing the defendant must have acted with purpose). The State need not prove the underlying offense was committed; "it is the agreement that is pivotal." Samuels, 189 N.J. at 245-46. But the elements of the conspiracy charged in the indictment must be considered vis-à-vis the underlying offense or offenses. Id. at 246.

The underlying offenses charged in the Radio Lofts conspiracy include certain provisions of the theft by extortion and criminal coercion statutes. N.J.S.A. 2C:20-5 provides, in pertinent part:

> A person is guilty of theft by extortion if he [or she] purposely and unlawfully obtains property of another by extortion. A person extorts if he [or she] purposely threatens to:
>
> . . . .
>
> c. Expose or publicize any secret or any asserted fact, whether true or false, tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute;

d. Take or withhold action as an official, or cause an official to take or withhold action; [or]

. . . .

g. Inflict any other harm which would not substantially benefit the actor but which is calculated to materially harm another person.

The correlating model jury charge describes the elements of the offense as follows:

1. That defendant obtained the property of another.

2. That defendant obtained that property purposely and unlawfully.

3. That defendant obtained the property by extortion.

[Model Jury Charges (Criminal), "Theft by Extortion (N.J.S.A. 2C:20-5)" at 2 (rev. June 5, 2006).]

Pertinent to this appeal, the term, "[o]btain in relation to property means to bring about a transfer or an apparent transfer of a legal interest in the property, either to the defendant or to another." Ibid.; see also N.J.S.A. 2C:20-1(f). Extortion requires that a person purposely threatens to commit any of the acts enumerated in the statute, including those cited above. See id. at 3-4.

Similarly, N.J.S.A. 2C:13-5(a) provides, in pertinent part:

A person is guilty of coercion if, with purpose unlawfully to restrict another's freedom of action to

70

engage or refrain from engaging in conduct, he [or she] threatens to:

. . . .

(4) Take or withhold action as an official, or cause an official to take or withhold action; [or]

. . . .

(7) Perform any other act which would not in itself substantially benefit the actor but which is calculated to substantially harm another person with respect to his [or her] health, safety, business, calling, career, financial condition, reputation or personal relationships.

In the accompanying model jury charge, the elements of criminal coercion are stated as follows:

(1)    that the defendant threatened to (choose from [N.J.S.A. 2C:13-5] (a)(1) to (7)); and

(2)    that the defendant acted with purpose unlawfully to restrict another's freedom of action to engage or refrain from engaging in conduct.

[Model Jury Charges (Criminal), "Criminal Coercion (N.J.S.A. 2C:13-5)" at 1-2 (approved Jan. 11, 2016).]

"Our interpretation of a statute is guided by well-established principles."

State v. Oliver, 482 N.J. Super. 401, 418 (App. Div. 2025).  As we recently reiterated in Oliver:

"The overriding goal of all statutory interpretation 'is to determine as best we can the intent of the Legislature, and to give effect to that intent.'" The plain text of a statute "is the 'best indicator' of legislative intent." "The '[c]ourt may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language.'"

Accordingly, "[w]hen the Legislature's chosen words lead to one clear and unambiguous result, the interpretive process comes to a close, without the need to consider extrinsic aids. When the plain language is ambiguous, however, [courts] consider extrinsic interpretative aids, including legislative history." "If an ambiguity in a criminal statute is not resolved by reviewing the text and extrinsic sources, the rule of lenity dictates that the ambiguities must be interpreted in favor of the defendant." We do so mindful that "penal statutes are to be strictly construed."

[482 N.J. Super. at 418 (alterations in original) (emphasis added) (citations omitted).]

Applying these principles of construction here, it is clear the language of the theft by extortion and criminal coercion statutes largely overlaps. Compare N.J.S.A. 2C:20-5(d), with N.J.S.A. 2C:13-5(a)(4); compare N.J.S.A. 2C:20-5(g), with N.J.S.A. 2C:13-(a)(7). All sections of both statutes require the commission of a threat. Although neither statute nor our case law expressly defines the term, "threat" specific to the extortion or criminal coercion context, neither statute purports to cover all threats. Rather, the identified threats must

fall within the ambit of one of the definite categories, or the remaining catch-all category. As the model jury charges make clear, the type of threat employed is an element of the offense. Accordingly, the type of threat must be supplied on the face of the indictment and cannot be left to presumption. See De Vita, 6 N.J. Super. at 347.

Both statutes also apply only where a defendant intends to achieve the goal through the threat itself, not through the threatened action. N.J.S.A. 2C:20-5 applies where a defendant "purposely . . . obtains property by extortion," and defines "extortion" as making certain threats. N.J.S.A. 2C:13-5 applies where a person makes threats "with purpose unlawfully to restrict another's freedom of action." This interpretation of the text is bolstered by the existence of other statutes criminalizing the taking of either property or free choice by act rather than threat. See State v. Churchdale Leasing, 115 N.J. 83, 104 (1989) (remarking "the Legislature 'ordinarily does not intend to punish the same offense under two different statutes'" (quoting Whalen v. United States, 445 U.S. 684, 692 (1980))).

For example, an individual who obtains property of another by threatening to inflict bodily injury or physical confinement, faces charges of extortion. N.J.S.A. 2C:20-5(a). But if the individual obtains the same property by actually

inflicting bodily injury or actually subjecting a victim to physical confinement, the individual faces charges of robbery, N.J.S.A. 2C:15-1(a)(1), or kidnapping, N.J.S.A. 2C:13-1(a).  It follows, then, that reliance on a threat – rather than on the threatened action – is a necessary element of the offenses underlying the remaining timely Radio Lofts conspiracy.

In addition, the primary difference between N.J.S.A. 2C:20-5 and N.J.S.A. 2C:13-5 is the actor's purpose:  extortion is designed to "obtain[] property of another," N.J.S.A. 2C:20-5; coercion seeks to "restrict another's freedom of action," N.J.S.A. 2C:13-5.  The specific intent elements are particularly crucial because, without the need for an improper purpose, both statutes would criminalize a wide array of otherwise permissible behavior.  See, e.g., State v. Roth, 289 N.J. Super. 152, 158 n.4. (App. Div. 1995) (explaining that "many of the threats criminalized by the [extortion] statute 'would be perfectly appropriate if made without a demand for property'" (quoting Cannel, New Jersey Criminal Code Annotated, cmt. 3 on N.J.S.A. 2C:20-5 (1995))).

In Roth, the defendant was convicted of theft by extortion after threatening "to file a motion to set aside a sheriff's sale unless the successful bidder paid him $2,000."  Id. at 155.  The defendant, charged under the "catchall" subsection of N.J.S.A. 20C:20-5(g), argued he stood to "substantially

benefit" by challenging the sale and therefore did not fall within the ambit of the statute. Id. at 158. We rejected the argument that defendant, who was strapped for cash and not a serious participant in the market, could "substantially benefit" either by promoting general competition or overturning the sale. Id. at 158-59.

The defendant's final argument, that his threat was no more than "an offer to settle a legitimate lawsuit," relied on the 1971 Commentary to the New Jersey Penal Code. Id. at 160 (citing 2 The New Jersey Penal Code: Final Report of the New Jersey Law Revision Commission § 2C:20-5, at 227-28 (1971) (1971 Commentary)). We recognized:

> The 1971 Commentary acknowledges that a law which included every threat made for the purpose of obtaining property would encompass a significant portion of "accepted economic bargaining." Ibid. (emphasis added). Therefore, certain commercial or economic menaces have been excluded from the purview of the statute, such as threats
>
> > to breach a contract, to persuade others to breach their contracts, to infringe a patent or trade[]mark, to change a will or persuade another to change a will, to refuse to do business or to cease doing business, to sue, to vote stock one way or another. For the most part these are situations in which a private property economy must tolerate considerable "economic coercion" as an incident to free bargaining. Civil remedies are usually adequate to deal with abuse of the privilege.

[Id. at 160-61 (second emphasis and third emphasis – from "to refuse" to "to sue" – added) (quoting 1971 Commentary, at 227-28).]

However, we disputed the defendant's reliance on this provision and his characterization of the "offer to settle." Id. at 160-61. In so doing, we "reject[ed] the notion that the 1971 Commentary merely requires a threat to assume the guise of a lawsuit to bypass the statute's mandate of a substantial benefit." Id. at 161. We held "before exempting threats otherwise considered illegal under this provision, the Code drafters intended an economic or commercial nexus to exist between the actor who utters these 'protected' threats and the underlying transaction." Ibid.

Although we decided Roth in 1996, we are unaware of any cases that have either applied or overturned this aspect of its holding in the intervening years. The State argues the court's focus in Roth was limited to a violation of N.J.S.A. 2C:20-5(g), whereas the indictment in the present matter also cited subsections (c) and (d), along with N.J.S.A. 2C:13-5. See Roth, 289 N.J. Super. at 155.

In our view, however, Roth's holding applies to all subsections of the theft by extortion statute, as the 1971 Commentary demonstrates. The 1971 Commentary's discussion of N.J.S.A. 2C:20-5 is comprised of a "General Scope" portion, followed by individual portions for each statutory subsection.

1971 Commentary § 2C:20-5, at 227-30. The economic bargaining exemptions are located in the "General Scope" portion, suggesting they apply to all subsections. Id. at 227. Moreover, because the threats proscribed under N.J.S.A. 2C:20-5 and N.J.S.A. 2C:13-5 are similar, as expressly cross-referenced in the text of the 1971 Commentary, we discern no reason why the economic bargaining exemptions would not apply to the coercion statute. See 1971 Commentary § 2C:13-5, at 189 (recognizing "[t]he threats here outlawed parallel those found in the Theft by Extortion provision (Section 2C:20-5)").[18]

Against these principles, we turn to the viability of the Radio Lofts conspiracy as alleged in count four of the indictment. Based on our de novo review, we conclude the indictment did not satisfy the elements of conspiracy to extort or coerce Developer-1 to relinquish his Radio Lofts rights.

As a preliminary matter, the indictment did not allege an agreement among George, Philip, and Tambussi to extort or coerce Developer-1 to relinquish his rights to Radio Lofts. See Samuels, 189 N.J. at 245. The indictment contained limited factual allegations connecting defendants to Radio

---

[18] Exempting a wider swathe of economic behavior is consistent with federal practice. Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 523 (3d Cir. 1998) (recognizing "fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions").

A-1833-24

Lofts:  in a number of October 2016 phone calls, George suggested the Radio Lofts rights should be condemned or could be used as leverage for the LPT deal. Philip replied it was better to focus on extinguishing the Victor Lofts view easement.  Around the same time, LPT drafted a proposed deal based on George and Philip's negotiations with Developer-1 that would require LPT and Camden Partners to support and facilitate Developer-1's Radio Lofts redevelopment efforts.  Then, in a March 2018 "stakeholders" meeting with City officials, Philip suggested the City delay Developer-1's request to transfer the Victor PILOT agreement as leverage to induce him to surrender the Radio Lofts redevelopment rights.  No other defendants were alleged to have been present.  Tambussi, among other attorneys, represented the City and the CRA when, as a result of the delay, Developer-1 sued.

None of these allegations suggested an agreement.  The 2016 call alleged, if anything, a disagreement.  The draft deal suggested LPT and the Enterprise members foresaw Developer-1's retaining his Radio Loft rights.  Philip was the only defendant at the March 2018 meeting, just as Tambussi was the only defendant who represented the CRA following Developer-1's lawsuit.  No further facts demonstrating coordination were alleged.  Nor did the allegations suggest a unity of purpose as George appeared to view the Radio Lofts rights as

a "pressure" point to advance the LPT deal completed in late 2016, well before Philip broached the issue with City officials in March 2018.

Even if the indictment were construed to allege an agreement, however, the putative threats identified for this offense did not fit the necessary criteria for theft by extortion or criminal coercion. The indictment did not allege George, Philip, or Tambussi – or any member of the Enterprise – conveyed or caused to be conveyed, a threat to Developer-1 related to the Radio Lofts settlement. Instead, the indictment asserted Developer-1 identified general notions of corruption and the cost of litigation as the motivation for the settlement – not a threat from an Enterprise member.

Criminal coercion and theft by extortion require the defendant make a threat with purpose to either exert control over, or extract property from, a victim. N.J.S.A. 2C:13-5; N.J.S.A. 2C:20-5. "A person acts purposely with respect to the nature of his [or her] conduct or a result thereof if it is his [or her] conscious object to engage in conduct of that nature or to cause such a result." N.J.S.A. 2C:2-2(b)(1). If the defendant does not expect a threat to reach a victim, the defendant's conscious object cannot plausibly be to manipulate the victim with that threat. Cf. State v. Crescenzi, 224 N.J. Super. 142, 146-47 (App. Div. 1988) (approving of a conviction for "knowingly attempt[ing]" to

tamper with a witness where the defendant knew that his threats would reach their target "or that there was a high probability thereof"); cf. also State v. Dispoto, 189 N.J. 108, 121-22 (2007) (recognizing a terroristic threat need not be conveyed "directly to the victim for the threat to be actionable," but must be made "with the purpose to put [the other] in imminent fear" (alteration in original) (first citing Cesare v. Cesare, 154 N.J. 394, 403 (1998); and then quoting N.J.S.A. 2C:12-3(b))).

Yet in this case, the indictment did not allege that any such communication occurred or was anticipated. More particularly, the indictment disclosed private conversations among Enterprise members in October 2016, during which they discussed the possibility of advocating for a condemnation action against Developer-1. However, these discussions were focused on a possible condemnation of the Victor Lofts view easement to facilitate the LPT deal that would lead to Triad1828 Centre and 11 Cooper. While George raised the possibility of exerting pressure via Radio Lofts, Philip dismissed the idea and the focus remained on the view easement.

In any event, there was no allegation in the indictment that Developer-1 was made aware of these conversations, defendants intended to inform him of them, or there was a high probability these statements would reach him. Further,

according to the indictment, while the Enterprise already was pursuing the condemnation action, George and Philip spoke with Developer-1 and his attorney and did not mention the possibility of condemnation. Nor did the indictment allege any Enterprise member threatened Developer-1 with potential legal or regulatory actions.

Equally, the indictment did not allege when Philip discussed Developer-1's Radio Lofts rights at a March 2018 "stakeholder" meeting, that discussion was ever brought to Developer-1's attention. According to the indictment, Philip suggested to City officials that they "slow[] down" the approval to "create a 'legal strategy' to deal with Developer-1's Camden interests" and "cause Developer-1 to forfeit DPI's option to redevelop Radio Lofts."[19] City officials then proceeded by sending a letter purporting to unilaterally terminate the redevelopment option. Neither the plan suggested by Philip, nor the action executed by the City, is alleged to have been communicated to Developer-1 in advance. Thus, the indictment did not assert Developer-1 was subject to any

---

[19] The indictment appeared to assume, without explanation, that the PILOT transfer would be approved. Likewise, the indictment did not indicate the context of Philip's statements, that is, whether he was responding to a question or offering unprompted advice.

A-1833-24

extortionate or coercive threats as a result of the 2018 meeting, nor that defendants planned such a threat.

Moreover, the indictment stated CRA and CFP officials conferred among themselves, the CRA prepared a letter "purporting to terminate" Developer-1's redevelopment rights, and the CRA board thereafter approved a termination action. According to the indictment, Developer-1 became aware of the potential foreclosure and associated legal action against him on April 20, 2018, when the CRA sent correspondence stating his redevelopment rights were terminated. Developer-1 then sued the City and the CRA resulting in a settlement five years later. The indictment did not allege any defendants were parties to the lawsuit, or that they received the settlement proceeds.

In summary, because the indictment: (1) did not allege any Enterprise members threatened or planned to threaten Developer-1 to transfer his rights to Radio Lofts; (2) did not assert the defendants named in count four, or any Enterprise member received, or aimed to receive, Radio Lofts property; and (3) affirmatively alleged Developer-1 relinquished his property as the result of a lawsuit he initiated against the City, the indictment did not assert a conspiracy

A-1833-24

to commit either extortion or coercion. We therefore discern no error in the court's dismissal of count four on the merits.[20]

### 3. Financial Facilitation

The financial facilitation offenses, charged in counts five through ten, all were premised on the concept that the tax credits associated with the various development projects constituted "property known or which a reasonable person would believe to be derived from criminal activity." N.J.S.A. 2C:21-25. Stated another way, the State argues tax credits, as pled in the indictment, represented proceeds of criminal activity. Because the facial deficiency of these charges confounds a statute of limitations analysis, we address the merits.

Diorio is instructive. The Court observed N.J.S.A. 2C:21-25 "requires two 'transactions,' (1) the underlying criminal activity generating the property, and (2) the money-laundering transaction where that property is either (a) used to facilitate or promote criminal activity, or (b) concealed, or 'washed.'" 216 N.J. at 622 (quoting State v. Harris, 373 N.J. Super. 253, 266 (App. Div. 2004)).

---

[20] Because we conclude the indictment failed to allege an Enterprise member threatened Developer-1 to relinquish his Radio Lofts rights – and the conspiracies alleged in counts one through three were time-barred – we have no occasion to reach whether any purported threats fell within the economic bargaining exemptions under the extortion and coercion statutes.

Crucially, then, criminal activity must "generat[e]" property and the defendant must transact "that property." Ibid.

Here, the indictment charged defendants with possessing or transacting tax credits, but the tax credits were not "generated" by criminal activity. As the motion court found, the government awarded tax credits pursuant to legitimate applications – and the State does not contend otherwise. At most, the alleged criminal acts generated property rights. The redevelopment projects eventually yielded occupiable property that, in turn, made certain defendants eligible for tax credits. Because the property "generated" from criminal activity was not the same property alleged to have been transacted, the financial facilitation offenses charged are not viable.

#### 4. Corporate Misconduct

Little need be said regarding the corporate misconduct offenses charged in counts eleven and twelve. Both counts alleged defendants "use[d], control[led], and operate[d]" various corporations to promote, among other things, financial facilitation. Count eleven related to Cooper Health and the L3 deal, and count twelve related to Triad1828, 11 Cooper, and the associated companies. Both counts relied on the underlying charges of theft by extortion, criminal coercion, financial facilitation, and, in count twelve, official

misconduct.  As we have explained, each of the underlying charges failed either because they were time-barred or facially deficient.  It therefore follows counts eleven and twelve similarly fail.

### 5.  Official Misconduct

In count thirteen, the indictment alleged all defendants violated subsection (a) of the official misconduct statute, N.J.S.A. 2C:30-2, between January 1, 2014 and December 31, 2017.  The motion court found Redd undertook no criminal action after the statute of limitations for this offense expired in June 2017.  Having left her mayoral position on January 1, 2018, the court rejected the State's argument that Redd obtained her 2018 position at Rowan/Rutgers as "a reward for faithful service and fidelity to the Enterprise," finding instead she simply "got a new job at a time she needed one."  The court deemed the State's theory "that the job was a quid pro quo and a financial reward for corrupt participation . . . conclusory supposition."  Finding Redd's actions between 2013 and 2016 "clearly time-barred," the court concluded, "[a]ll she did after June 2017 was finish her term and get a job."

As to the validity of the charge, the motion court found for each act in the indictment attributed to Redd, she acted within her rights by not exercising the powers of her office beyond their authorization or withholding action she was

compelled to take. The court further found the indictment failed to allege facts supporting the conclusion Redd received any reward from the Enterprise, much less that her actions were dictated by the prospect of receiving an award.

Consistent with its global statute of limitations argument, the State maintains Redd was a member of the Enterprise, which existed for the purpose of receiving tax credits, and assisted the Enterprise throughout her mayoral term. Alternatively, the State contends the indictment validly alleged Redd received the Rowan/Rutgers position as "a benefit for her participation."

As to the validity of the charge, the State contends the court's analysis was inappropriately exacting, imposing too high a standard for showing an official duty, breach, and intent. The State argues Redd committed four acts that fall under the statute: (1) "instructing the CFP CEO to meet regularly with members of the Enterprise to ensure that CFP's projects were pre-approved . . . and redirect[ing] CFP's CEO to Philip . . . when he came to her for help"; (2) "[c]utting off communication with Developer-1 and ignoring his requests for help with the Radio Lofts"; (3) "[a]greeing to use the Enterprise's reputation . . . to help intimidate and threaten"; and (4) "[t]elling CFP's CEO that his 'job was in jeopardy' for resisting the Enterprise's demands." The State

notes, "[i]f a duty is required, the court overlooked that Redd owed a duty to serve the public with good faith and integrity."

Pertinent to this appeal, pursuant to N.J.S.A. 2C:30-2:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself [or herself] or another or to injure or to deprive another of a benefit:
>
> a. He [or she] commits an act relating to his [or her] office but constituting an unauthorized exercise of his [or her] official functions, knowing that such act is unauthorized or he [or she] is committing such act in an unauthorized manner[.]

Accordingly, under subsection (a) of the official misconduct statute, the indictment must allege the defendant: (1) "was a 'public servant' within the meaning of the statute"; (2) acted "with the purpose to obtain a benefit or deprive another of a benefit"; (3) "committed an act relating to but constituting an unauthorized exercise of [his or] her office"; and (4) knew "such act was unauthorized or that [he or] she was committing such act in an unauthorized manner." State v. Bailey, 251 N.J. 101, 129 (2022) (quoting Saavedra, 222 N.J. at 58); see also Model Jury Charges (Criminal), "Official Misconduct (N.J.S.A. 2C:30-2)" at 1 (rev. Sept. 11, 2006) (setting forth the elements of the offense). "[T]he benefit can be obtained for the actor or 'another.'" State v.

Schenkolewski, 301 N.J. Super. 115, 144 (App. Div. 1997) (quoting N.J.S.A. 2C:30-2); see also Bailey, 251 N.J. at 129.

Pursuant to the official misconduct statute, a defendant can be found guilty only if the alleged misconduct was "sufficiently related" to the defendant's role as a public employee or official, or his or her official duties. State v. Kueny, 411 N.J. Super. 392, 407 (App. Div. 2010) (quoting State v. Hinds, 143 N.J. 540, 546 (1996)). "It is insufficient to show that an act of misconduct was 'committed by a person who happens to be a public officer.'" State v. Gibson, ___ N.J. Super. ___, ___ (App. Div. 2025) (slip op. at 26-27) (quoting Schenkolewski, 301 N.J. Super. at 144). "There must be a relationship between the misconduct and public office of the wrongdoer, and the wrongdoer must rely upon his or her status as a public official to gain a benefit or deprive another." Kueny, 411 N.J. Super. at 407. Acts that are only tangentially related to a defendant's office do not fall under this statute. See State v. DeCree, 343 N.J. Super. 410, 418 (App. Div. 2001) (holding the defendant's participation in a fraud scheme was not official misconduct because it "had nothing to do" with her particular office and "everything to do with her public employment and participation in the State Health Benefits Program").

"Moreover, the indictment charging official misconduct must allege both the prescribed duty of the office and facts constituting a breach thereof." Thompson, 402 N.J. Super. at 192 (quoting Schenkolewski, 301 N.J. Super. at 144). A qualifying duty may be assigned by law or arise out of the particular nature of the office. See ibid. To violate the statute the actor must "knowing[ly] fail[] to perform a duty." Id. at 198. "The duty must be 'one that is unmistakably inherent in the nature of the public servant's office, i.e., the duty to act is so clear that the public servant is on notice as to the standards that he [or she] must meet.'" Ibid. (quoting Hinds, 143 N.J. at 545-46).

We turn to the State's assertion that Redd's Rowan/Rutgers hiring in 2018 extended the seven-year statute of limitations for official misconduct. Based on our review of the indictment, the charge itself failed to allege Redd's Rowan/Rutgers CEO position was the benefit she acted with purpose to obtain. Rather, the thrust of the indictment was that Redd acted to obtain benefits for the Enterprise and to deprive the putative victims, CFP and Developer-1, of benefits. The Rowan/Rutgers position, conversely, was not mentioned until December 2017, well after both redevelopment deals were completed and after any alleged interactions between Redd and CFP and Developer-1.

These allegations on their face did not allege Redd committed the alleged acts of misconduct with the intent or expectation she would receive the Rowan/Rutgers position. A more natural reading suggests she intended, at worst, to transfer benefits from CFP and Developer-1 to the other defendants and their associates. Because Redd's last act involving the real estate dealings occurred in 2016, when she allegedly stopped returning Developer-1's calls, at the latest, the offense concluded at that time.

The State asserts in a footnote if receipt of compensation did not extend the statute of limitations, "a corrupt official could evade the limitations period by instructing a bribe-payer to deliver funds seven years and a day after she leaves office—at which point it would be too late. That cannot be right." Indeed, it is not right. Neither the official misconduct nor bribery statute requires actual receipt of payment; purpose, offers, solicitations, and agreements suffice. N.J.S.A. 2C:30-2; cf. N.J.S.A. 2C:27-2; In re Coruzzi, 95 N.J. 557, 564-65 (1984) (discussing the defendant's three bribery convictions, two where "he received the money" and a third conviction where "he solicited the bribe but never received it"). Thus, a delayed payout scheme would not prevent immediate prosecution. Alternatively, an express agreement to commit

90

misconduct, conceal that misconduct for seven years, then exchange payment would constitute an actionable conspiracy.

However, just as the State cannot rely on "mere overt acts of concealment" to "wipe out the statute of limitations" and "extend the life of a conspiracy indefinitely," Grunewald, 353 U.S. at 402, we hold the State cannot rely on the mere receipt of a benefit, which is not an element of the offense, to extend the life of an official misconduct charge indefinitely.   The State's proposed framework, where a payment could revivify an otherwise time-barred prosecution when the indictment did not allege an express agreement for such payment, would impermissibly permit any gift Redd received from an alleged Enterprise member – no matter how remote or unsought – to reset the clock, contravening the right to "prompt prosecution."   Diorio, 216 N.J. at 612.  We therefore conclude, as a matter of law, the official misconduct offense charged in count thirteen was time-barred.

\* \* \* \* \*

In conclusion, notwithstanding the duration of the grand jury proceedings, the undisputed voluminous record considered by the grand jurors, and the resultant lengthy speaking indictment, we discern no error in the motion court's decision to entertain defendants' facial challenges.  Pursuant to our de novo

facial review of the indictment, for the foregoing reasons, we are persuaded the offenses underlying the conspiracies charged in counts one through three, and the official misconduct charge asserted in count thirteen, were untimely and, as such, palpably defective, see Winne, 12 N.J. at 181-82; counts four through ten failed to state the offenses charged; and counts eleven through twelve were time-barred and otherwise failed to state an offense.  Our decision does not prevent the State from re-presenting any counts not barred by the applicable statutes of limitations.

In view of our disposition, we need not consider the "routine practice of law" arguments raised by Philip and Tambussi, as supported by Legal Amici. To the extent not addressed, any remaining arguments lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

The interim stay issued by the motion court on February 26, 2025 is vacated, subject to the parties' rights to pursue an appeal in the Supreme Court within forty-five days.  If an application is filed within that time frame, the stay shall remain in force until such time as the Court may direct.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-1833-24